[No. 12655. *En Banc.* March 6, 1915.]

THE STATE OF WASHINGTON, *on the Relation of J. W. Brislawn et al., Plaintiff*, v. EDWARD MEATH *et al., Respondents.*[1]

CONSTITUTIONAL LAW — LEGISLATIVE POWERS — INFRINGEMENT BY COURTS—ACTS—TIME OF TAKING EFFECT—DETERMINATION OF EMERGENCY. The legislative declaration that an act is necessary for the immediate preservation of the public peace, health or safety, or support of the state government and its existing institutions, and shall take effect immediately, thereby cutting off the people's right of referendum, is subject to review by the courts, and will be held unconstitutional where the law, on its face, shows that the declaration is false, although, if the act be doubtful, the question of emergency will be treated as a legislative question and the act upheld; in view of the initiative and referendum amendment to the constitution (Laws 1911, p. 136), providing that the people reserve to themselves the power to propose and enact laws, independent of the legislature, and to approve or reject, by the power of referendum, any act passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety or support of the state government and its existing institutions, which amendment repeals Const., art 2, § 31, providing that no law except appropriation bills shall take effect until ninety days after adjournment, unless in case of emergency, which emer-

[1]Reported in 147 Pac. 11.

gency shall be expressed in the act, and provides in lieu thereof that no law subject to referendum shall take effect until ninety days after adjournment (the time within which the referendum may be invoked); taking into consideration the old law, the mischief, and the remedy, and the fact that the constitution leaves no room for the exercise of discretion by the legislature in the given cases.

STATUTES—TIME OF TAKING EFFECT—EMERGENCY CLAUSE. Laws 1915, p. 19, § 1, amending Rem. & Bal. Code, § 6605, relating to the personnel of the board of state land commissioners, and substituting for the appointive state tax commissioners and fire warden, the elective secretary of state and state treasurer, is not an act that is necessary for the immediate preservation of the public peace, safety or the support of state government, within the initiative and referendum amendment to the state constitution providing that such laws are not subject to the referendum; hence § 2 of the act, declaring such fact and providing that the act shall take effect immediately is unconstitutional.

STATUTES—CONSTRUCTION. While previous constructions of constitutional provisions, adopted from another state, are persuasive, they are not conclusive when not sustained by reason or when based on a misconception of the law.

STATUTES—CONSTRUCTION. While a wrongful practice, if long continued, may result in a procedure, it cannot, however long continued, operate to repeal or nullify a constitutional mandate.

MORRIS, C. J., MOUNT, FULLERTON, and CROW, JJ., dissenting.

Application filed in the supreme court February 23, 1915, for a writ of *quo warranto* to determine the right to office as members of the board of state land commissioners. Granted.

*Troy & Sturdevant,* for relators.

*The Attorney General,* for respondents.

CHADWICK, J.—At the first session of the state legislature, 1889-90, several boards were created to administer the public lands of the state. In 1893, the several acts were amended so that an independent board with full jurisdiction over state lands was provided for. The board consisted of the commissioner of public lands, ex-officio member and chairman of the board, and three members, to be appointed by the governor. Laws of 1893, p. 386. The act of 1893 was amended in 1895. The commissioner of public lands was

made a member of the board with two others to be appointed by the governor. Laws of 1895, p. 528. In 1897, the act was again amended. The board was made to consist of elective state officers, the commissioner of public lands, secretary of state, and superintendent of public instruction. Laws of 1897, p. 229. In 1907, the act was again amended. The board was made to consist of the commissioner of public lands, state fire warden and forester, and the state board of tax commissioners. Laws of 1907, p. 290. This personnel was maintained in the amendatory act of 1909. Laws 1909, p. 757. The law defining the board of state land commissioners has been carried into Rem. & Bal. Code, as § 6605 (P. C. 477 § 13). At its present session, the legislature passed an act amending § 6605, Rem. & Bal. Code:

"Section 1. . . . The commissioner of public lands, the secretary of state and the state treasurer shall constitute the board of state land commissioners and shall have all powers and perform all duties with reference to the selection, appraisement and sale or lease of school, granted or other lands, except capitol building lands, the establishment of harbor lines and lease of harbor area which are now or may hereafter be vested in or required of the board of state land commissioners, the board of appraisers or the harbor line commission. And said board of state land commissioners shall be and serve as the commission and the board of appraisers mentioned in section one of article fifteen and section two of article sixteen of the state constitution.

"Section 2. This act is necessary for the immediate preservation of the public peace and safety and the support of the state government, and shall take effect immediately." Laws 1915, ch. 6, p. 19.

It will be seen that, for the state fire warden and forester and the board of state tax commissioners, the secretary of state and state treasurer are substituted.

Section two of the act, the emergency clause, was vetoed by the governor. The bill was passed over the governor's veto. A new board was immediately organized, consisting of the three state officers mentioned in the act. It has assumed

the function of administering the public lands of the state to
the exclusion of the relators, the state tax commissioners and
fire warden.    These officers bring this proceeding in *quo
warranto*, praying that the right of respondents be inquired
into and that they be ousted and enjoined from further in-
truding themselves in the office.

There is but one question to be decided.    Whether the legis-
lature can declare an emergency in the instant case so as to
free the act of the restraints contained in the recent amend-
ment to the constitution known as the initiative and referen-
dum amendment.

When the people adopted the constitution in 1889, it con-
tained a provision:

"No law, except appropriation bills, shall take effect until
ninety days after the adjournment of the session at which
it was enacted, unless in case of any emergency (which emer-
gency must be expressed in the preamble or in the body of
the act) the legislature shall otherwise direct by a vote of
two-thirds of all the members elected to each house; said
vote to be taken by yeas and nays and entered on the
journals."    Const., art. 2, § 31.

This clause, in one form or another, is common to most of
the states.    The *Attorney General* states the broad premise
that a court will not, under any circumstances, review the dis-
cretion of the legislative body, and that a legislative declara-
tion of an emergency has always been regarded as not open
to judicial inquiry.    He cites several cases, but inasmuch as
they are taken from Cyc., which we cite below, we will not
encumber this opinion by setting them out.

Where there is a declaration in the constitution that no
law shall take effect unless in a case of emergency to be de-
clared by the legislature, it may be truthfully said that the
general rule is that a court will not review the declaration
of the legislature; but where the people have put upon the
legislature a limitation in the way of a specific definition of
its power and an elimination of acts of a certain character,

the rule is that the declaration of an emergency must conform to the constitutional requirement.

"In those jurisdictions in which, under the general rule, statutes do not take effect until some time subsequent to their passage and approval, it is commonly provided that when an emergency exists the legislature may declare a statute in force from its passage. Under such provisions the legislature is the sole judge as to whether an emergency exists, and its declaration is not open to question by the courts. Where, however, such special provisions, permitting the legislature to except certain statutes from the general rule, are found in the constitution, the legislative declaration that an emergency exists must conform to the constitutional requirements, and must be clear, distinct, and unequivocal." 36 Cyc. 1193, 1194.

See, also, Cooley, Constitutional Limitations (7th ed.), 76.

At the general election held in November, 1912, the people of the state adopted the initiative and referendum amendment to the constitution. By this amendment, it was provided that no law or bill subject to the referendum shall take effect until ninety days after the adjournment of the legislature at which it was enacted, and that all laws shall be subject to referendum except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions.

We shall assume, for it is not seriously contended that it is not so, indeed, it could not be so contended, that in truth and in fact the amendment to § 6605, which does no more than to remove from the board one man or set of men and replace them with other men, is not in fact "necessary for the immediate preservation of the public peace, health or safety" of the state.

It is the contention of the respondents that the provision for an emergency in the amendment is in no respect different from that contained in Const., art. 2, § 31, and that the courts are powerless to inquire into the act or discretion of the legislature; that we are governed by the same rules and by the

same considerations which have moved the courts since the establishment of our government to put no judicial restraints upon legislative discretion.

The contentions of the respondents have seemingly—we say seemingly for it is not entirely so—been upheld by the courts in Oregon, South Dakota and Arkansas. *Kadderly v. Portland*, 44 Ore. 118, 74 Pac. 710, 75 Pac. 222; *Dallas v. Hallock*, 44 Ore. 246, 75 Pac. 204; *Bennett Trust Co. v. Sengstacken*, 58 Ore. 333, 113 Pac. 863; *Sears v. Multnomah County*, 49 Ore. 42, 88 Pac. 522; *State ex rel. Lavin v. Bacon*, 14 S. D. 394, 85 N. W. 605; *Arkansas Tax Commission v. Moore*, 103 Ark. 48, 145 S. W. 199. While the supreme court of Michigan and the court of appeals in California have held, under a provision the same as ours, that there *may* be a judicial question to be reviewed by the courts. *McClure v. Nye*, 22 Cal. App. 248, 133 Pac. 1145; *Attorney General ex rel. Barbour v. Lindsay*, 178 Mich. 524, 145 Pac. 98. Oklahoma has held both ways: *Oklahoma City v. Shields*, 22 Okl. 265, 100 Pac. 559; *In re Menefee*, 22 Okl. 365, 97 Pac. 1014; *Riley v. Carico*, 27 Okl. 33, 110 Pac. 738.

There has been a wide inconsistency in the holding of the courts upon constitutional questions. They have declared that, where the legislature has said there is an emergency, although undefined, its declaration is final and conclusive upon all. At the same time, and in the same day, they have not hesitated to declare acts of the legislature to be in derogation of the fundamental law or some of the legislative limitations of the constitution.

The judicial aversion to a review of legislative discretion, in so far as it relates to emergency clauses, is no more thoroughly established than the equivalent declaration that courts have power to declare laws unconstitutional. Now there is no more reason for saying that a bill is an emergent measure, when upon its face it is not, and from the very nature of its subject-matter cannot be, just because the legis-

lature has said it is so, than there is for declaring a law to be unconstitutional when it has been passed by the legislature with the constitution and its limitations lying open before it. The sense and discretion of the legislature, as well as its power to discriminate between an act falling clearly without and one falling clearly within the constitution, should, if we are consistent, be given the same weight as a declaration that an act is emergent, but few courts have so held since *Marbury v. Madison,* 1 Cranch (U. S.) 49, although their inconsistencies have long been apparent to the lay mind. In the one case we have said that we will inquire, in the other we have said that we will not inquire, saying meanwhile that we will indulge every presumption in favor of a law and will not declare it unconstitutional unless it is clearly violative of the constitution.

In passing upon all questions involving a construction of statutes and constitutional declarations and limitations, there is no better test than to consider the old law, the mischief and the remedy. It was a favorite premise of those venerable sages who have digested the common law and preserved it in authoritative writings. It is still the vital principle in every inquiry into the legality or constitutionality of a statute, for,

"The fairest and most rational method to interpret the will of the legislator is by exploring his intentions at the time when the law was made, by *signs* the most natural and probable. And these signs are either the words, the context, the subject matter, the effects and consequence, or the spirit and reason of the law." 1 Blackstone, Commentaries, p. 59.

It will be borne in mind that the whole scope, purpose and intent of § 31, art. 2, is most materially changed in the amendment. Section 31 says:

"No law, except appropriation bills, shall take effect until ninety days after the adjournment of the session at which it was enacted, unless in case of any emergency (which emer-

gency must be expressed in the preamble or in the body of the act) the legislature shall otherwise direct . . ."

While paragraph "c" of § 1, art. 2, of the seventh amendment to the constitution, providing for the initiative and referendum, is as follows:

"No act, law, or bill *subject to referendum* shall take effect until ninety days after the adjournment of the session at which it was enacted."

This provision must be read in the light of the whole amendment and the intention of the people as it is gathered from their approving vote. The object of the amendment, in so far as it touches the taking effect of bills or laws, was to secure the right of review. In paragraph "b" of the same section it is provided:

"The second power reserved by the people is the referendum, and it may be ordered on *any* act, bill, law, or *any part* thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions."

If specific reservation in words of the right to subject *all* laws to the referendum were not enough, the preamble of the amendment makes it clear that the people intended to assert that the revised and amended clause of the constitution permitting emergent legislation should not be a dead letter, as was § 31 which was expressly repealed. They said:

"The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the state of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, *at their own option*, to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature." Laws of 1911, p. 136.

At the time § 31 was written in our constitution, it had already been declared by other courts to be a still-born child,

a voice dying in the utterance of a command; putting no restraint upon the legislature and being beyond the range of judicial interference. It was, in legal effect and under judicial construction, as barren as if no words had been written after the section number. With this fact and this rule of construction before them, may we not ask why the people, upon second opportunity to speak to the subject, so radically changed the form of § 31? They must have had in mind the inconsistent declarations of the courts which we have noticed, as well as the fact that the legislature had habitually ignored the spirit of § 31. They desired and intended to mark a line between laws that might be emergent and those which clearly were not. Otherwise they would not have changed the words at all, but would have left it as the minority say they did, a dead letter, by readopting the words of § 31, or by allowing it to stand unrepealed. They did change the words, and in so doing marked the boundary between emergent laws and non-emergent laws, not upon lines or theories of legislation, but over a well blazed trail of legal construction. They fixed a limit beyond which the legislature cannot go without doing violence to the will and voice of the people. It is that current in the judicial stream marked by certain phases of the police power, and the support of the state government and its existing institutions. Of the police power, it is said:

"In fine, when reduced to its ultimate and final analysis, the police power is the power to govern. It is not meant here to be asserted that this power is above the constitution, or that everything done in the name of the police power is lawfully done. It is meant only to be asserted that a law which interferes with personal and property rights is valid only when it tends reasonably to correct some existing evil or promote some interest of the state, and is not in violation of any direct and positive mandate of the constitution." *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466.

So in this case we have, for the first time in the history of this state, a positive recognition of the police power in

the constitution itself.    The difficulty experienced by the courts in applying this doctrine and the great and growing variance of definition, and of which Chief Justice Shaw, whose definition is most favored, said, "It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise" (*Commonwealth v. Alger*, 7 Cush. 53, 85), has come from the natural hesitation of legislative bodies to enter new fields of legislation under a general welfare clause, and the disinclination of courts to give judicial sanction to laws limiting or creating rights not recognized as proper subjects of legislation or judicial interference at common law.

But here there can be no doubt of the limitation put upon the power of the legislature to declare emergencies, or of the courts to sustain them.    In the new enactment, they have not only fixed the limit but have restricted it to the primary elements of the police power, the "health, peace and safety" of the state.    It was done deliberately.    The people said to the legislature, make such laws as you will, but you may not legislate so as to take away our right to pass upon the law you have just enacted, "except such laws as may be necessary for the immediate preservation of the peace, health or safety, support of the state government and its existing institutions." It is certain ground, for men will not usually differ in opinion where the immediate preservation of the peace, health or safety of the state is at stake.    To hold that the old rule of construction applies, is to write this reservation out of the constitution.

In the case of *Kadderly v. Portland*, 44 Ore. 118, 147, 74 Pac. 710, 75 Pac. 222, which is the leading case upon the other side (it is indeed the only case, as all others holding in the same way are lined upon it), this phase of the case is discussed and concluded in the way following:

"The constitution of Oregon, article IV, § 28, giving the legislative assembly power to put any law into force upon approval by declaring an emergency, has been modified by

the amendment of 1902, so as to exclude from the power to declare an emergency all laws except those necessary for the immediate preservation of the public peace, health, or safety. So far, all are agreed. But the vital question is, what tribunal is to determine whether a law does or does not fall under this classification? Are the judgment and findings of the legislative assembly conclusive, or are they subject to review by the courts? The inquiry is much simplified by bearing in mind that the exception in the constitutional amendment is not confined to such laws as the legislative assembly may legally enact by virtue of the police powers of the state, or to those alone that may affect the public peace, health, or safety. The police power is limited to the imposition of restraints and burdens on persons and property, in order to secure the general comfort, health, and prosperity of the state: Tiedeman, Lim. Pol. Power, § 1. But the language of the constitutional amendment is broader, and includes all laws, of whatsoever kind, necessary for the immediate preservation of the public peace, health, or safety, whether they impose restraints on persons and property, or come strictly within the police powers, or not. The laws excepted from the operation of the amendment do not depend alone upon their character, but upon the necessity for their enactment in order to accomplish certain purposes. As to such laws, the amendment of 1902 does not in any way abridge or restrict the power of the legislature, which, by the insertion of a proper emergency clause, may unquestionably cause them to go into effect upon approval by the governor. As the legislature may exercise this power when a measure is in fact necessary for the purposes stated, and as the amendment does not declare what shall be deemed laws of the character indicated, who is to decide whether a specific act may or may not be necessary for the purpose? Most unquestionably, those who make the laws are required, in the process of their enactment, to pass upon all questions of expediency and necessity connected therewith, and must therefore determine whether a given law is necessary for the preservation of the public peace, health, and safety."

We hesitate to match opinion with one so learned in the law as the writer of this opinion, but conscience impels a different conclusion. His argument is fallacious and unsound. Under the old form, the legislature was acting under a free license

to legislate.    The people had reserved no right of review. Its act implied discretion, and courts had very properly held that one coordinate branch of the government will not review the discretion of another.    There was no review or appeal from an expression of that discretion, however violently it wrenched the moorings of constitutional restraint.    The declaration of an emergency was final and conclusive.    But here no such declaration is final, and should be given no immediate effect unless it can be fairly said that the act is necessary to preserve the health, peace or safety of the state or to support the government or its institutions.

"The courts are not bound by mere forms, nor are they to be misled by mere pretenses.    They are at liberty—indeed, are under a solemn duty to look to the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority.    If, therefore, a statute purporting to have been adopted to promote the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."    *Mugler v. Kansas,* 123 U. S. 623, 661.

The reservation in the amendment is a declaration of "thou shalt not," except it be for the safety or support of the state.    Broadly stated, the police power of the state is the state's law of self-defense, in respect to both persons and property.    *Carstens v. DeSellem,* 82 Wash. 643, 144 Pac. 934.

The learned justice who wrote the opinion in the *Kadderly* case is in error when he says the obvious answer to the question,

"What remedy will the people have if the legislature, either intentionally or through mistake, declares falsely or erroneously that a given law is necessary for the purposes stated?" is "that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision

of the highest court in a case over which it has jurisdiction."
*Kadderly v. Portland, supra,* p. 150.

On the contrary, power has been withheld, in so far as a withholding can be made by apt and certain words. It follows, then, that it is a question of power rather than of discretion. The limitation of that power must be found in the terms of the constitution, construed in connection with the intent of the people in incorporating such a provision in the constitution. *Attorney General ex rel. Barbour v. Lindsay,* 178 Mich. 524, 145 Pac. 98.

We think it will not be denied that a case might be postulated where the courts would say that the discretion of the legislature has been abused. *Riley v. Carico, supra.*

If this be so, the case at bar is such a case. Suppose, for instance, that the legislature had amended the law so as to reduce the legal rate of interest; legalize a bond issue once declared to be invalid; or, create a legal holiday, and declare an emergency, would any one say that the act should take effect immediately because the health, peace, or safety of the state demanded it? Surely no one would have the hardihood to argue that it was not a deliberate withholding of the right of referendum. Our thought is evidenced in the case of *Oklahoma City v. Shields,* 22 Okl. 265, 305, 100 Pac. 559. In that case the court said, after some discussion and quotation from the *Kadderly* case,

"We conclude that the judgment of the legislature in determining whether or not an emergency existed—that is, whether or not a measure is immediately necessary for the preservation of the public peace, health, or safety—rests solely with the legislature. It is not subject to review by the courts, or any other authority except the people. Under the reserved power of the initiative and referendum, after the declaration of an emergency when not referred to the people for their judgment in such measure it still remains with the people, if they are dissatisfied with a measure, by an initiative petition to cause the same to be submitted to the people at the next general election for determination as to whether or not such act shall be repealed."

The judges evidently did not consider their words "It [the declaration of an emergency] is not subject to review by the courts, or any other authority except the people." They recognized that it is subject to review by the people, but they say that it shall not be reviewed in the way the people have said they will review it if they so desire. It is no answer to the proposition to say that the people have a remedy under the reserved power of initiative; that if they are dissatisfied with the act of the legislature they may initiate a bill to repeal the measure at the next general election. If the people had been content to adopt that plan alone, they would not have reserved the right of the referendum at all. When, therefore, the question comes whether the legislature has a right to declare an emergency which will take away the right of referendum, the doubt, if there be any, should be resolved in favor of the reserved power of the people instead of in the admittedly unwarranted declaration by the legislature. And in so declaring, the courts do not assume to say that the legislature has abused its discretion. They go no further than to say that the legislature cannot, by any act which is not clearly within its granted power, cut off the right of the people to say for themselves, at an election to be held for that purpose, whether its discretion has been abused, or no.

Now in this case the amendment does not touch the substance of the law relating to public lands. It says no more than that "A" shall give place to "B" on the state land board. It does not show wherein, and we cannot assume that, the act of "B" if continued as a member would incite breaches of the peace or jeopardize the safety of the state, or that the presence of "A" will give support to the state government where the presence of "B" would tend to its destruction. If the legislature passed an act granting a divorce to named persons and should say "this is a general law," every court in the land would say that the act was unconstitutional because the people had said "thou shalt not." It is so here. The people, having the old law, the mischief, and the remedy

in mind, have said one thing; the legislature, prompted by no apparent motive to preserve the peace and safety (they might with as much reason said health) of the state, have said another thing. When confronted by these two conflicting declarations, what is a court to do when its jurisdiction is properly invoked? Is it to say, it is helpless, or is it to say,

"The said legislative declaration has no greater effect and is no more binding upon the court than if the legislature had declared that a certain measure is or is not constitutional. In such contingency that question would still remain for the courts to determine. The question before us is simply one of construction or interpretation of an act of the legislature and of a provision of the constitution, and that is a judicial question." *McClure v. Nye*, 22 Cal. App. 248, 133 Pac. 1145, because,

"This amendment to the constitution provides a scheme for the exercise of what is known as the initiative and referendum and, of course, if possible, the language should be construed so as to make effective this reservation of power on the part of the people. It was clearly their purpose, except where the exigency of the public service demanded otherwise, that no legislative enactment should become operative until an opportunity were afforded the people to express their judgment as to the merits of the measure. The time within which a petition may be presented in contemplation of this action by the people is limited to ninety days after the adjournment of the legislature, and hence the manifest propriety of suspending for said period the operation of any measure that should be thus reviewed. The exceptions provided are ample enough to prevent any menace to the public welfare by reason of such delay incidental to a submission to popular vote, and they should not be given an interpretation so elastic as virtually to circumvent and nullify the will of the people so solemnly expressed in said constitutional provision." *McClure v. Nye, supra.*

The distinction between the power of the legislature to act in all cases where the limitation of its power is not definitely fixed in the constitution itself and where it is so fixed, is clearly marked and illustrated in the case of *Guthrie Nat.*

*Bank v. Guthrie,* 173 U. S. 528. Speaking of the limit of legislative power, the court said:

"That body is especially prohibited from passing any local or special law in regard to certain subjects enumerated in the act. Outside and beyond that limitation is the provision above mentioned [where a general law can be made applicable no special law shall be enacted], and whether or not a general law can be made applicable to the subject is a matter which is confided to the judgment of the legislature."

In other words, if the constitution says that no special laws shall be enacted where a general law can be made applicable, the decision of the legislature as to the proper bound of its authority will be treated as a legislative question and will not be reviewed by courts, but if the constitution specifically says that in a certain case, as for instance, the granting of municipal charters, no special law shall be passed, there is no room for discretion, and courts will review and say that a law passed in defiance of the constitutional limitation is no law. It is so in this case. The old law was that no act should take effect immediately except in a case of emergency. The courts very properly refused to define the boundary between discretion and abuse of discretion. The present constitution marks that boundary just as clearly as it has marked the boundaries covering certain subjects of special legislation. It has left no room for the exercise of discretion to the legislature when passing upon acts which are not, and cannot from their nature and subject-matter be held to be, necessary for the immediate preservation of the health, peace, or safety of the state or support of the government or the state institutions.

The whole error in the reasoning of the respondents, and the cases upon which they rely, is based upon the fundamental error that this inquiry involves a controversy of opinion between co-ordinate branches of the government. If the equation could be so stated, we might follow them. It cannot be so stated. There is another factor not occurring under the

old order where we took account of the executive, the representative body (the legislature) and the courts. There is now a fourth element, the people, reserving the right to assert its will over the legislative department of the government.

"Where the principle of direct legislation has been adopted, the legislative power is primarily in the people, and the old rule that the legislative body has primary power must be qualified. It is primary, and at the same time it is a permissive power—a power subject to dictation and to control." *Stetson v. Seattle*, 74 Wash. 606, 134 Pac. 494.

The true rule is: the referendum cannot be withheld by the legislature in any case except it be where the act touches the immediate preservation of the public peace, health, or safety, or the act is for the financial support of the government and the public institutions of the state, that is, appropriation bills. If the act be doubtful, the question of emergency will be treated as a legislative question, and the doubt resolved in favor of the declaration of emergency made by the legislative body.

Emergency, in the sense of the present constitution, does not mean expediency, convenience or best interest. There is no room for construction or speculation. The declaration is equivalent to saying that the referendum shall not be cut off in any case except in certain enumerated instances, none of which now occur.

We have treated the question as original or of first instance in this court, fully mindful of the rule that when one state adopts the laws or constitutional provisions of another state, it is generally held that constructions of the adopted law go along with it. This is an accepted rule and is supported by many cases and text writers, but no cases go so far as to hold that such rule is imperative or binding. Such constructions are persuasive but not conclusive. They will not be followed where they are not sustained in reason, or proceed from a misconception of the law, or are put upon a fundamentally wrong basis.

We think we have sufficiently met the *Kadderly* case.  In doing so, we have also met the other cases relied on, for they were all decided upon the authority of that case; but, if we have not, the *Kadderly* case can be distinguished in that it involved an act creating a charter for the city of Portland. Cities are vested with the power to exercise the police power, and we may well say that the act fell without the exception or was so doubtful as to warrant the conclusion, if not the argument, of the court.

Without further reviewing the cases, it is enough to say that none of them grasp the reason or philosophy of the recent change in the fundamental law.  They are in step with a tune that is dead.  It is no answer to say that courts have always held to a certain rule, for as we have shown, the present condition has not existed heretofore.  The first of the adjudged cases did not note the change, or rather did not count it as a change at all, and the others have followed it blindly and with the usual reverence for "authority."  As Judge Dunbar said in *State ex rel. Oregon R. & Nav. Co. v. Railroad Commission,* 52 Wash. 17, 100 Pac. 179, "Law is a progressive science."  If this be so, courts should not put themselves to the task of groping for "authority" to sustain a statute or an amendment to the constitution when it is clearly within the power of the legislature to pass it or of the people to adopt it.

But we are asked, How we can say what is within the police power and what is not?  The answer is, How did we say, in the many cases decided by this court, that a given condition was within or without the police power?  By the exercise of reasonable judgment; by measuring the premise by the standard, would the minds of reasonable men, in the light of the needs and necessities of the present, agree that the act is within the police power.  And here let us reassert that the power of the legislature to except acts touching the police power is limited to acts immediately necessary to the preservation of the health, safety and peace of the state.  It is not extended

to the general welfare or to the service of economy or con-
venience.

It may be argued that we can judicially notice the fact
that the legislature is about to, or has, passed an act abolish-
ing the state tax commission, and that this fact gives room for
the exercise of a legislative discretion in the act under review.
Our answer is, and we have sufficiently demonstrated it to be
true, that there is no unlimited discretion. Nor will the
functions of the state land commission be in any way inter-
rupted by the fact that there may be a vacancy in its member-
ship for a period of ninety days. Many boards are adminis-
tered by a number less than the whole membership. We can-
not presume that the peace and safety of the state or the
support of its public institutions depends upon the act of a
full board where a lesser number can transact its business
with the same legality and formality as if the board were full.
It may be argued that this holding will interrupt the future
policy of the state as declared by the legislature; that inas-
much as a change must in any event be made, the court should
not take it upon itself to say that the change should not be
made immediately. Our answer is that we are not responsible
for the present situation. The people have a right to adopt
any system of government they see fit to adopt. In its work-
ings, it may not meet their expectations; it may be unwieldy
and cumbersome; it may tend to inconvenience and prodi-
gality; it may be the expression of a passion or sentiment
rather than of sound reason; but it is the people's govern-
ment and, until changed by them, must be observed by the
legislature and protected by the courts.

It may be suggested, also, that it is possible that some ar-
rangement has been or may be made with the Federal govern-
ment for the transfer of lands in lieu of lands lost to the speci-
fic congressional grants, and that the government might pre-
fer to conduct its business with one board without the inter-
ruption incident to a change in the personnel of the board.
We have sufficiently met this argument by the suggestion

that the constitution does not take into account convenience or necessity, except in so far as it touches the peace, health and safety of the state, nor can it be said that the personnel of the board can in any way affect the support of the state institutions.   Courts must presume, until the contrary is shown, that every man who is in public office is competent to discharge the duties of that office, and that one man will perform his duty as conscientiously and with the same ability as another.   If it were not so, the unfinished business of the government or the state would never be concluded.   The personnel of the officer is only an incident.   The office continues and we have no right to assume—for it is not shown to be so—that the relators will not discharge the duties of their office and with the same fidelity as will the respondents when they become incumbent.   It may be added that the manner in which we administer our public lands is of no concern to the Federal government or any of its bureaus.

"The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."   Const., United States, Amendment X.

The *Attorney General* seeks to sustain his argument by reference to certain powers of the governor and the legislature, that is, that the governor may convene the legislature in extra session upon "extraordinary occasions;" the House may impeach and the Senate may convict "for high crimes or misdemeanors or malfeasance in office;" and reminds us that we would not in those instances assume to question the discretion of either the legislature or the governor.

The reason why the courts will not review such discretion is that no jurisdiction to inquire is vested in the courts by the constitution, and none is reserved by the people.   If, however, the constitution provided, either expressly or by implication, that such declarations of the executive or legislative department should not become effective until a certain time had

11—84 WASH.

elapsed, giving the people an opportunity to review the executive or legislative act, we would unhesitatingly declare that any act which tended in any degree to cut off this reserved right would violate the fundamental law. In the one case, the people did not see fit to provide for a review. In the instant case, they have reserved the right of review. The essence of our reasoning is not that the legislature has abused its discretion; that is really immaterial; but that the people shall have a right, if they see fit, to review its act and place the stamp of approval or disapproval upon it.

It was suggested in consultation that, whereas, the public institutions of the state are supported, in part at least, out of the public lands, we can say that it is for the legislature to determine whether the due administration of the public lands demands an amendment to the existing law; that it is a legislative and not a judicial question. Granting that this question might arise, it is not before us. The amendment does not go to the substance of the law or in any way touch matters of administration. It says only that the personnel of the board shall be changed, and this we have sufficiently discussed.

Neither is there any merit in the contention that the practice of the legislature to declare emergencies, and of the governor to approve them, running over the past twenty years, has been continued since the amendment of 1912 was adopted. A wrongful practice, if long continued, may result in a procedure. But however long continued, it will not repeal or nullify a constitutional mandate.

In so far as this case is concerned, it may be said that it can make no real difference whether this law goes into effect at the present time or ninety days after the close of the session. It is not at all likely that there will be a referendum. The people are not so much concerned in the name of the individual who administers the office as they are in the fact that the office is administered, and certainly it will not be doubted that respondents are capable of performing the duties of the office. But the principle involved is just as vital

as if it were a real case. In so far as it touches the initiative and referendum amendment to the constitution, it is as important as an act which may reasonably be expected to invite a review by referendum.

The real question is, Can the people, as distinguished from a representative legislative body, indulge in constructive legislation and reserve that right without interference by the legislature or the courts, except where, in certain enumerated instances, they have waived the right in order that the immediate necessities of health, peace and safety and the support of the government and our public institutions may be met by their representatives duly convened in legislative session? Section two of the act, amending § 6605, violates the seventh amendment to our constitution, and is void. The act will take effect ninety days after the legislature has adjourned. The writ will issue.

PARKER, HOLCOMB, MAIN, and ELLIS, JJ., concur.

FULLERTON, J., dissents.

MOUNT, J. (dissenting)—The majority of this court has declared that the act under consideration is not necessary "for the immediate preservation of the public peace, health, or safety, support of the state government and its existing public institutions." The legislature, a coordinate branch of the state government, on the other hand, has declared that the act is necessary for that purpose. The conclusion of this court is based upon the face of the act, which apparently removes one set of officers and substitutes other officers therefor. No facts are before us for consideration. It may be true that a change in these officers will not in the least affect the public peace, health, or safety, or the support of any state institution. But that depends entirely upon conditions and facts considered by the legislature, of which, in the very nature of things, we can have no knowledge. If the public peace, or health, or safety, is threatened, then no doubt the legislature has power to put into immediate effect any act

which in its judgment may be necessary for the preservation
thereof. So far as we are advised, there is no immediate ne-
cessity for this act; but we are not advised upon that ques-
tion. It may be true that the public peace and health and
safety all demand the passage of some act for our immediate
preservation. It may be true that this act was passed solely
for that purpose, and that it was necessary to conceal the real
object of the act in such a manner that its real purpose might
not be obvious upon the face of the act. Who is to determine
the facts upon which the law is based, and which called its
enactment into existence, the legislature or the courts? This
is the only question in this case. The answer obviously is,
the legislature, because no other tribunal has been established
for that purpose. As was said in the case of *Kadderly v.
Portland*, 44 Ore. 118, 74 Pac. 710, 75 Pac. 222:

"The amendment excepts such laws as may be necessary
for a certain purpose. The existence of such necessity is
therefore a question of fact, and the authority to determine
such fact must rest somewhere. The constitution does not
confer it upon any tribunal. It must therefore necessarily
reside with that department of the government which is called
upon to exercise the power. It is a question of which the leg-
islature alone must be the judge, and when it decides the fact
to exist, its action is final."

See, also, *State ex rel. Lavin v. Bacon, Oklahoma City v.
Shields*, and *Arkansas Tax Commission v. Moore, supra*, and
other cases cited in the majority opinion.

The majority of this court apparently concede that, if the
public peace, health, or safety is really threatened, then the
legislature may put an act for the immediate preservation
thereof into immediate effect. At least, if that position is not
conceded, it is apparent from the provisions of the constitu-
tion quoted. When this is conceded, it follows that the legis-
lature must determine the facts; otherwise, no emergency
could be declared, and no law could take effect until the ex-
piration of ninety days from the adjournment of the legisla-

ture. The rule of the majority necessarily nullifies the constitutional provision under consideration, and will create confusion and doubt in every case of emergency, because the rule is now established by the majority opinion that the courts must decide the fact of an emergency.

The constitutional provisions under consideration in this case were borrowed from South Dakota, Oregon, and Oklahoma. These states had decided the question here presented contrary to the view of the majority prior to the time this state adopted the amendment. See cases cited in the majority opinion. We knew the construction which had been placed thereon by those states, and presumably adopted that construction with the amendment. If there can be any doubt upon the proper construction of this constitutional provision, and the power of the legislature, that doubt should be resolved in favor of the construction placed thereon by those states.

The writ, in my opinion, should be denied. I therefore dissent.

Morris, C. J., and Crow, J., concur with Mount, J.