Marshall, C. J.,
dissenting. I conceive it to be the most laudable purpose of a dissenting opinion to record a protest against declarations of principles which are unsound, and to prevent such declarations from becoming firmly established precedents; to serve notice upon all present and future members of the court that a wrong has been committed and should and must be righted at the earliest opportunity. It is in this frame of mind that I enter upon the discharge of an unpleasant duty. The dominant portion of the court has *607 robbed the sacred constitution of our state and taken from it one of its- vital and essential elements — the referendum.
It is the true province of the courts to decide causes, not to nullify laws and constitutions. The majority opinion has with elaborate citation of authority shown that the judicial branch of our government has always upheld and sustained the work of the legislative branch, unless -clearly beyond the power delegated to it by the people, and has employed this course as the sole grounds of upholding this piece of political legislation. In its zeal to uphold the work of the representatives of the people in a ripper bill it has nullified a vital portion of the. work of the people themselves. The cardinal principle of upholding legislative enactments, unless clearly in' excess of the power conferred upon the legislature by the constitution, has its source in the division of the powers of government into three branches and the deference to be properly shown by each of those branches to the others. Such deference is due from this court to the legislative branch, and this court would be exceeding its constitutional power if it lightly nullified an act of the legislative branch. The difficulty with the majority opinion, however, is that it has entirely overlooked the dual constituency of the legislative branch, and in an excess of zeal to uphold the action of one wing of the legislative branch, to-wit, the general assembly, it has ruthlessly trampled under foot and destroyed the reserved legislative power of the other wing, to-wit, the people.
*608 On every page of the majority opinion may be found abundant evidences of a struggle. The four do not agree upon the methods to be employed and are only able to agree upon a question which is not involved. Two of the four deliberately turn their backs upon principles heretofore established not only with their concurrence and approval but also by means of their emphatic support. A new meaning has been given to words, contrary to well-settled adjudications. A strained construction has been placed upon language entirely free from ambiguities.
More than half the entire opinion is devoted to the discussion of the proposition that only a political question is involved, in which proposition only Judges Jones and Matthias concur. In the remainder of the opinion Judges Robinson and Hough concur in the proposition that the issue is a justiciable one, but that it pertains solely to the constitutionality of the emergency clause.
The emergency clause, though required by the constitution to be made a separate section of the bill itself, is no part of its operative provisions. It is merely intended as a statement of reasons to justify the legislature in making the provisions of the law immediately operative, thereby forestalling a referendum. It contains none of the elements of a law; it is not in any sense a rule of action or human conduct; it contains no order commanding what is right or prohibiting what is wrong.
The formal requirements of the constitution have been met when the separate section declaring the “reasons” has been added to the bill, and a separate *609 roll call taken, receiving a two-thirds vote of all the members of each house. If the executive branch of the government should attempt to execute the provisions of a law immediately after its passage, without such law having a separate section declaring the “reasons,” and without the required vote on a separate roll call, such attempted execution could be enjoined and a constitutional question would be presented, because it would involve a question of legislative power and not a question of legislative policy.
When, however, the action of the legislature is formal and regular, but the “reasons” are wholly deficient in substance, or irrelevant to the provisions of the bill, or unfounded in fact, or where the emergency is fanciful only, the question is a judicial one.
Let us illustrate. Our constitution provides that where private property is taken for public use, compensation shall first be made, the same to be assessed by a jury, without deduction for benefits. This court has recently .ruled that where a jury is in fact impaneled to assess the damages, no constitutional question is presented, even though error may have intervened in the conduct of the trial. The error would be reviewable as a judicial question. By parity of reasoning the error of judgment of the legislature is reviewable as a justiciable question, but no question of constitutional power is involved.
The constitutionality of the Administrative Code is not an issue in this controversy. This question *610 may arise and have to be determined in some future action, but the issue has not been made in this action, either in the pleadings or in the briefs and arguments of counsel. For the purpose of this controversy it may be admitted that the act is constitutional. The majority opinion has laboriously raised a man of straw and then pretended to knock him over. The structure was laborious because it was accomplished without materials of any kind, but the act of knocking him over was easy because he never had any foundation to rest upon'.
The legislature has constitutional power to codify the administrative laws of the state, and in so doing may create new offices and change the titles of those already existing. It may define the duties of new officers and enlarge or diminish the powers and duties of those already existing.
All these things have been done, and nothing more has been done.
No question of the constitutionality of a law is presented to this court for determination, because it is not claimed that any part of this law transcends the legislative power conferred by the constitution.
Under and by virtue of the former constitutions we had only one lawmaking body in Ohio — the legislature. Under the amendments of 1912 we still have the legislature, with restricted powers, and, in addition thereto, another legislative body is recognized — the people. The direct legislative power of the people is exercised by means of the initiative, and the restrictions upon the powers of *611 the legislature are exercised by means of the referendum.
There being therefore two distinct, concurrent legislative bodies, having power to deal with the same subject at the same time, and the people having at the same time the right by referendum to review and possibly nullify the action of the legislature, it is quite natural that a conflict should occasionally arise between the two legislative bodies, and this is exactly what has occurred-in the present instance. Both legislative bodies are limited to the powers conferred and are subject to all limitations contained in both the federal and state constitutions, and if either body in the attempted performance of its legislative functions transcends those powers and limitations its acts are subject to review at the hands of this court, in a case in which the issue is properly raised; but such review does not involve the question of the constitutional validity of such legislative acts.
It is equally 'within the province of this court to judicially determine the issues arising between the two legislative bodies when either seeks to exercise its powers without due regard to the rights of the other, or, when, as in this .case, the legislature proceeds in a manner which if unchallenged would prevent a review of its action at the hands of the people.
The legislature has passed the bill and the constitutionality of its provisions is not challenged. The legislature has from the standpoint of parliamentary law complied with the requisites of a two-thirds majority on the bill itself and a like majority *612 on separate roll call on the emergency declaration, and has also stated certain reasons for the necessity, all of which make a prima facie case. The relators challenge the validity of the “reasons for the necessity” stated in Section 5, alleging that they do not relate in any ■degree whatever to “the immediate preservation of the public peace, health or safety.”' The question is, therefore, does this challenge the constitutionality of the law itself, that is to say, raise the question -whether the legislature has kept within the bounds of the legislative authority conferred by the constitution in the governmental provisions of the bill, or, on the other hand, does it merely present a legal controversy between the two lawmaking bodies, quite independent of constitutional powers and limitations ? Surely it is the latter situation which confronts us.
Being in the minority, and having therefore the negative position in the controversy, it would seem that we should examine the majority opinion and attempt to answer the arguments adduced in support -of the claim that it is a constitutional question. An examination of the majority opinion discloses the startling fact that it does not contain a syllable of argument that it is a -constitutional question. After admitting that only Judges Jones and Matthias are willing to take the position that the legislative fiat upon “the reasons for the necessity” is conclusive, and further admitting that five of the seven members of this court believe that a justiciable and not a political question is involved, the majority opinion devotes the larger space to the proposition that a statute should not be declared *613 unconstitutional unless its invalidity is clear beyond a reasonable doubt. No judge or lawyer has any quarrel with such a rule when it is really applied to such a problem. The instant case does not present such a problem. We are here concerned with a controversy between the general assembly and the people; and the effect of the majority opinion, and the effect of the application of the rule of certainty and clarity beyond a reasonable doubt, is to require the people to demonstrate beyond a reasonable doubt that they have reserved the right of referendum on this bill. It would seem more logical, inasmuch as the general assembly under former constitutions had the sole lawmaking power and in 1912 the people took away a portion of that power and made certain reservations in the power left remaining in the general assembly, that the constitutional provisions creating such reserved power should be construed most favorably to the people.
This is the view expressed in the case of State, ex rel. Brislawn, v. Meath, 84 Wash., 302.
The power of review reserved to the people was general, and the exceptions were limited only to tax levies, appropriation bills for current expenses and emergency measures. Having undoubted power to provide for review of all legislation, and having clearly manifested and expressed its determination to make some reservation of legislative power, it is unthinkable that the constitutional convention intended to put a weapon in the hands of the legislature to destroy the right of review by the simple *614 expedient of declaring an' emergency where no emergency in fact existed.
This proposition was discussed in the case of State, ex rel. Goodman, v. Stewart, 57 Mont., 144, and from page 171 of the opinion we quote:
“In this state’ it is the fundamental law that the people may themselves propose legislation, and may refer all Acts passed by the legislative body, suspending the operation of those Acts until the people have had the opportunity to either accept or reject them at the polls, except as to those Acts enumerated in the constitutional amendment; and, as to the particular exception here under consideration, it is clear that the people did not intend that the exception should, extend further than to those matters arising out of some unforeseen menace, public calamity, accident, sudden emergency, extraordinary occurrence or unprecedented climatic conditions, rendering immediate action imperative to prevent serious or irreparable injury to the public. It was certainly not the intention of the people, having determined to depart from the policy of, vesting all legislative power in a representative body, and to reserve to themselves the right to pass upon all Acts of the legislature, except as to those necessary for the immediate preservation of the public peace, public health, or public safety, to then place in the hands of the legislature a weapon to defeat and destroy that power so reserved and to nullify the constitutional reservation thereof.”
It may be conceded that courts should not declare any law unconstitutional unless there has been a clear assumption- of power, but on the other hand *615 there is an imperative duty to interfere when such assumption is clear.
This was the unmistakable pronouncement of Chief Justice Marshall in Marbury v. Madison, 1 Cranch, 137, and is a doctrine which has been recognized by every court which has exercised such jurisdiction, which of course includes Justices Waite, Washington, Shaw, Ranney, and others whose names and renown have been employed to support the views of the majority opinion.
Even though the question before the court were the determination of the constitutionality of the law, it would afford no justification for giving a strained or unwarranted interpretation to the constitutional provision. In the opinion of the two members reference is made to the proceedings of the constitutional convention, and to the rearrangement of Section Id, Article II, made by the committee on phraseology, and to the text of the address to the people. All this is doubtless on the theory that the language of this section does not express the true intent of the convention. A careful examination of all the proceedings of the convention discloses that there is no foundation for this theory. Section Id was rearranged after its first submission to the convention, but nearly all discussion of the initiative and referendum occurred after the revision, and the entire proposal was later submitted to a special committee of seven members, every one of whom was a well-known progressive and friend of the proposal. While the entire proposal received the most elaborate discussion there was not at any time any discussion of *616 Section Id on the floor of the convention. The emergency clause was worked out solely in the committees and was at all times, in the hands of its friends. The final draft was not in any sense a compromise, as alleged by the two members of the majority, but, on the contrary, the language finally employed was the result of deliberation in the committee room. The progressive spirit was paramount in the convention of 1912, and yet there was at no time the manifestation of any tendency to overthrow representative government. On the other hand there was an overwhelming majority of the delegates who were striving to secure a more adequate representation of the people, a more adequate expression of the people upon great public questions. The convention was in no sense revolutionary, but in the fullest sense evolutionary. Its deliberations resulted in the adoption of the initiative and referendum, not as substitutes for representative government, but with the design of making the government more truly representative. With the wisdom or unwisdom of the work of the convention, and the judgment of the people at the election which followed, whereby the present text of Section Id was ratified by a large majority, we ha!ve nothing to do. Regardless of whether or not the language of Section Id was changed in an unauthorized manner by the committee on phraseology, it is a rule of universal application, repeatedly declared by this court, that if there is no ambiguity or uncertainty in the meaning of the language employed there is no place for judicial construction. (Slingluff v. Weaver, 66 Ohio St., 621, and eleven *617 later cases.) Surely it cannot be claimed that any language found in Section Id is of doubtful meaning or import.
The majority of this court are of the opinion that the legislature may declare any law to be an emergency measure provided two-thirds of the members elected to each house concur in the validity of the reasons for the necessity, and that such declarations are final unless this court has judicial knowledge of their falsity. This position is wholly untenable. The requirement of a two-thirds vote is purely a parliamentary one and its fulfillment cannot make that true which can be proven to be false, neither will a self-evident fact, wholly impertinent to the main provisions of the law, constitute a compliance.
To illustrate let us suppose the legislature had declared in Section 5 that the reasons for the necessity lie in the fact that the summers are hot and the winters are cold. The court will take judicial notice of these facts, but no one would contend that the constitutional requirements are thereby met.
The language of Section Id is plain and unequivocal; there must be an emergency, and there must be a separate statement of facts constituting reasons which prove its existence. This requirement is not met by a fallacy or fiction; sophistry may not be substituted for reason; fact may not be supplanted by pure invention; the emergency must be real and not imaginative. It must be an emergency according to the accepted meaning, as defined by lexicographers; according to the meaning stated by *618 this court in the case of State, ex rel. Menning, v. Zangerle, 95 Ohio St., 1.
Much has been said by other dissenting judges about that case, which need not be repeated here; but it may properly be added that regardless of what argument may be made against the value of established precedent, and regardless of what may be said about judges and courts not being bound to follow other judges and courts, the bench, bar and litigants of the state of Ohio surely have the right to expect that upon such a radical change of position upon such important principles the court should at least announce some reason for the change.
In the Zangerle case the court had under -consideration Section 5649-4, General Code, and the emergency therein referred to pertained to tax levies for improvement of roads which had become out of repair.
That which was an emergency in 1916 is an emergency in 1921. If there is any difference or distinction between the emergency referred to in Section 5649-4, General Code, and the emergency of Section Id, Article II, the difference is altogether unfavorable to the majority opinion in the instant case, because in the instant case the emergency is limited to those things necessary to the immediate preservation of the public peace, health or safety. That is to say there must not only be a threatened danger to the public peace, health or safety, but the provisions of the act must be such as are necessary to immediately avert the threatened danger.
That is to say, before the writ of mandamus can *619 be refused in this case, it must not only be determined that an emergency exists, and that it is necessary to immediately take steps to avert a threatened danger, but it must also fairly appear that the main provisions of the act itself are designed to produce the “consummation devoutly to be wished.”
The majority opinion is grounded upon the theory that the state is in a deplorable financial condition, trending toward bankruptcy, and voices the immediate necessity either for increasing the revenues of the state or conserving the present revenues.
The act, however, does not pretend to do either of these things. Its purpose is properly expressed in its title, as follows: “To establish an administrative code for the state, to abolish certain offices, to create new administrative departments and redistribute among them existing administrative functions.” Its provisions are in full harmony with'its title.
The act creates no new administrative functions. It merely redistributes existing administrative functions among some officers now existing, and who will continue to exist, and-others created and established by the act. It is still the same government of the state of Ohio, with the same institutions, the same purposes to be served, and the same governmental agencies, to be known hereafter by other names. The form of the government is changed, but the substance remains; being neither enlarg-ed nor diminished.
*620 As an illustration of the foregoing statements it is well to refer to the provisions of the bill itself, and it will be found that the simplest and plainest illustration is in the provisions relating to the department of agriculture. In Section 154-26 (109 O. L., Ill), it will be found that the following offices heretofore existing in the department of agriculture have been abolished: the board of agriculture of Ohio, the secretary of agriculture, the head of the bureau of markets and marketing, the chief of the bureau of horticulture, the inspector of canneries, the board of control of the Ohio agricultural experiment station and the agricultural advisory board. It must not be inferred, however, from the abolition of these offices that the functions heretofore performed by their officers will be no longer performed. Neither must it be inferred that the expense of the salaries of those officers and of their hundreds of assistants will hereafter be saved. On the contrary it will be found that in the act itself, Section 2250, General Code (109 O. L., 128), has been amended and practically the same offices are provided for under different titles, with substantial increases of salary. The “Administration Code” provides for a “Department of Agriculture,” but it must not be assumed from this fact that no such department existed before. The fact is that beginning with Section 1079 of the General Code, and continuing through one hundred and seventy-nine other sections following that number, full provision was made many years ago for a department of agriculture, and in order that there may be no doubt left in the minds of the *621 readers of this opinion that the same governmental functions will be hereafter performed as have been heretofore performed I will quote from the Administrative Code (109 O. L., 120) the entire portion pertaining to the “Department of Agriculture,” as follows:
“Sec. 154-42. The department of agriculture shall have all powers and perform all duties vested by law in the board of agriculture, the secretary of agriculture, the agricultural advisory board, the chief of the division of fish and game under the board of agriculture, and all -officers and employes in such division, and in all other bureaus and offices established or authorized by law under the board of agriculture or the secretary of agriculture. Wherever powers are conferred or duties imposed by law upon such board of agriculture or secretary of agriculture, or upon bureaus or offices under either of them, such powers and duties shall be, excepting as herein provided, construed as vested in and imposed upon the department of agriculture.”
The foregoing section not only illustrates but conclusively proves that so far as the department of agriculture is concerned there will be no change either in the form or the substance of the government of that department. It will merely amount to a change in the titles of the officials who will perform the duties under increased salaries. Heretofore the head of the department was called a secretary. Hereafter he will be called a director. In one instance, the “Head of the Bureau” will be called “Chief of the Division,”
*622 It is possible, and indeed it is fondly hoped, that under the new titles the officials will render efficient service and give the taxpayers of the state an economical administration of their departments, but if so it will not be because of the change of title but rather because of a change of personnel. The words of Alexander Pope in his immortal Essay on Man are pertinent:
“For forms of government let fools contest;
That which is best administered is best.”
The act has nothing whatever to do with raising revenue or conserving the present revenues of the state. A careful reading of the entire act shows that nowhere except in the emergency clause is any reference made to revenues or wasteful or inefficient administration. Economy and efficiency are indeed laudable purposes to be attained in the administration of the affairs of the government, but Section Id, Article II, does not include economy or efficiency as reasons for declaring an emergency. If by a violent construction the words “peace, health and safety” should be construed to comprehend economy and efficiency, the bill is still wholly deficient of any provisions even tending to the production of economy and efficiency or the conservation of revenue. If the bill provided for withholding action upon the proposed improvement of a part or all of the highways now projected, or if it commanded the employment of a cheaper type of road, or if it placed a limitation upon the cost per mile for each type of road, or if it provided for *623 delays in the construction of proposed public buildings, or if it limited the activities in any or all of the executive departments, or if it placed a maximum limitation upon the expenditures of each or all of the departments, or if it provided for a reduction in the number of appointees, or a reduction in their salaries, or any one or more of a hundred other means which might be resorted to in order to bring the expenditures of the state within the revenues, there would then be some argument in support of the claim that the emergency clause does relate to the subject of economy and efficiency. All of these questions are justiciable, and not political, and may properly be submitted to the court for determination.
It seems to be conceded in the majority opinion that the court may consider anything of which it has judicial notice, and it is therefore proper to suggest that the appropriation bills which were passed by the general assembly prior to the adoption of the “Administration Code” were largely in excess of the appropriations of any preceding general assembly, and if it really was the desire of the general assembly to bring the expenditures of the government within its revenues the most potent plan to carry out this laudable purpose would have been to limit the appropriations within the revenues, thereby making it impossible for “the appointive state departments” to be “wasteful and inefficient” to the point where such a condition might “become a fertile field for communism, bolshevism and anarchy.” This court will of course take judicial notice of the appropriation bills and *624 a reference to those figures will be found to be of interest. The specific appropriations of the 84th general assembly, exclusive of moneys to be collected and expended for common schools, amount to $64,618,533.97. These large figures do not however include the appropriation of the proceeds of levies under house bill No. 325 (109 O. L., 360), to provide building funds for the universities of the state. This bill provides for a total levy of 375 thousandths of one mill to be levied upon all the taxable .property of the state for the years 1921-1922 and 1922-1923. These levies will produce for the two years approximately $7,500,000. These figures must therefore be added to the specific appropriations, bringing up the total to approximately $72,000,000.
The total expenditures for the last four fiscal years, each ending June 30, are as follows:
1917 —$21,293,020.88.
1918 —$22,827,295.61.
1919 —$25,934,104.33.
1920 —$29,579,264.84.
The figures for 1921 are not yet available.
It is a matter of common knowledge and therefore a matter of judicial knowledge that public officials will expend all the money which the legislature appropriates for the use of their respective departments, and it is only fair to presume that in the next two years the expenditures will total approximately seventy-two millions of dollars. This will be an increase of approximately sixteen and one-half million dollars over the two years ending June 30, 1920. All this is on the assumption that the *625 future sessions of the 84th general assembly will make no additional appropriations.
The provisions of the Administrative Code, and the real intentions of the legislators, must be judged not merely by the words of that code and the words of the emergency clause, but also by the other deeds and the other words of the general assembly, as expressed in the appropriation bills, the last of which was passed before the submission of this cause to this court.
Let us turn our attention to a further consideration of the emergency clause. It is claimed in argument by counsel for the respondent that it was only necessary that the reasons stated in the emergency clause should have some relation to the public peace, health and safety, and that the question was only justiciable to the extent that the court might determine whether or not there was any such relation; that the extent to which it related to the public peace, health and safety was a political question lodged in the discretion of the legislature. It may be conceded that the court may not interfere with legislative discretion in matters where discretion is lodged in the legislature. In the passage of any law where an emergency exists the legislature has discretionary power to declare or omit to declare its existence, and thereby cause or omit to cause such legislation to go into immediate effect. Such discretion does not, however, reach to the determination of the existence of the emergency.
Let us therefore more carefully analyze the rea *626 sons stated in the emergency. One of the reasons stated in the emergency clause is that the balance subject to draft in the general revenue fund of the state was on June 30, 1919, more than $2,000,000 and that on June 30, 1920, this balance had shrunk to less than $1,000,000. It is a matter of astonishment that in making such comparison the legislature selected the years 1919 and 1920. It is very easy to obtain the daily balance to the credit of the general revenue fund, and by reference thereto in the office of the auditor of state it is found that on April 26, 1921, the day this bill was approved, the balance was $5,756,522.46. On June 1, 1921, the day the cause was submitted to this court, the balance was $4,978,697.66; and on June 30, 1921, which was exactly one year later than the date when the balance was less than one million, we find the balance to be $3,957,779.73.
We refer with some emphasis to this feature of the case and to these facts, because it was this particular sentence in the emergency clause which was relied upon in the majority opinion, and it was the only sentence which was quoted therein.
' In the emergency section and also in the majority opinion we are cited to the annual reports of the state auditor, and by reference to that citation we find some startling facts. While the balance in one fund was less by one million dollars, the balance in the aggregate of all the other funds was six millions greater on June 30, 1920, than on June 30, 1919. The same reports and the law and constitution of the state give the reason why the general revenue fund was below normal at that time. *627 Laws providing direct levies for the state university and sinking fund had been repealed and the entire burden of the appropriations for those purposes fell upon the general revenue fund. On page 4 of the 1920 report the state auditor points out that the receipts for the general revenue fund were showing a rapid and encouraging growth and would be ample for all purposes. The figures for June 30, 1921, show that his prophecy became history.
Of what significance is a reduction of one million in one fund when there has been an increase of six millions in the other funds during the same period? Appropriations, expenditures, revenues, taxes, and public debt all increase each year until the prospect is truly alarming, but it does not present an emergency. It is a chronic state of affairs, which requires more drastic treatment than a wholesale change of the names and titles of our' public servants. A credit balance does not demonstrate efficiency in the public service, neither does a deficiency show the contrary.
But why was special and sole reference made to the general revenue fund? Manifestly it was because the other funds showed a larger instead of a smaller balance. Why was no comparison made of the cash balance in the treasury on those respective dates ? Manifestly it was because it was five millions greater on the latter date. ■ After all, appropriations, revenues and balances are within the control of the legislature, and a law which merely reorganizes the executive department does not strike at the root of the evil.
*628 If the diminishing balance between June 30, 1919, and June 30, 1920, was valid ground for the charge of wastefulness and inefficiency, then the rapidly growing balance between June 30, 1920, and June 30, 1921, ought to stand to the credit of the appointees who were theretofore charged with wastefulness and inefficiency.
Another of the “reasons” stated- in the emergency clause is: “The state service in the appointive state departments, shown by said investigations to be wasteful and inefficient, is becoming increasingly demoralized.”
It must be borne in mind that the “Administration Code” relates only to those departments under the direct control of the governor. The “appointive state departments” referred to are those departments whose heads and subordinates are appointed by the governor. Many of these can be removed at will. The terms of appointment of others have either expired or are about to expire, and surely the remainder could have been removed on the grounds of “wasteful and inefficient service.” Indeed, another clause of the “reasons” states: “At the convening of the eighty-fourth general assembly numerous vacancies existed in various state offices and in various state boards, and other like vacancies have occurred since that time.'” It clearly appears therefore that an investigation was made two years ago by a committee of the 83d general assembly, that its report showed “wasteful and inefficient service,” that it has all the while been in the power of the state executive to remove the unfaithful servants, and that *629 “numerous vacancies existed” which might have been filled six months before the law was passed, thereby preserving the public safety before the “immediate preservation” became so “necessary.” Surely some one has been fiddling while Rome has been burning.
The question before this court is, Shall the act go into effect immediately? Section 5 states that the necessity is “great and immediate.” Yet we find that though the act was approved April 26, its operative effect was by its terms voluntarily postponed to July 1. We further observe that though the general assembly was organized early in January, and though the investigations had been made two years previous, and though there were reports on file “declaring the necessity of reorganizing fundamentally the executive branch of the state government in order to promote efficiency and conserve the public funds,” nevertheless the fiddling continued to April 26 and then it was declared that the “immediate preservation” was not so “necessary” but that it might safely wait until July 1.
_ The situation was claimed to be so emergent that a delay of ninety days would greatly endanger the peace, health and safety, yet a delay from April 26 to July 1, a period of sixty-five days, could be negotiated with perfect safety.
By this decision a great wrong has been com-: mitted, a wrong which reaches much farther than the declaration of a false principle. The decision will ultimately be reversed and the true principle, the principle of the Miami Conservancy case and *630 the principle of the Zangerle case will be restored, but the real, the substantial damage, which consists in the outrage which has been perpetrated upon the people in nullifying the solemn provisions of the constitution by judicial pronouncement, instead of amendment and repeal by the means regularly provided, can never be repaired. That which was created by a large majority vote of the people in 1912, when every voter had an equal voice, may not be destroyed in 1921 by the votes of four members of this court. There is no place in this opinion for an argument upon the merits of the provisions of the Administrative Code. It may be assumed that it is a wise piece of legislation, but I deny that it was regularly enacted. Neither do I comment upon the merits of the principle of the referendum. The debate on that subject closed on September 3, 1912. Much has been said in late years about judge-made law, and its condemnation has been expressed in emphatic terms; we have here, however, a judge-made provision in the people’s constitution.
The majority opinion is a practical demonstration of the proposition that the power to interpret is the power to establish; it is equally the power to destroy.
The words of Abraham Lincoln in his first inaugural address, referring to the Dred Scott decision, are applicable: “If the policy of the government, upon vital questions affecting the whole people, is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made, in ordinary litigation between parties in personal actions, * * * the people will have ceased to be their own *631 rulers, having to that extent practically resigned their government into the hands of that eminent tribunal.”
By this decision the confidence of the people in representative government has been rudely shaken. The majority opinion pretends to see in the deplorable financial condition of our state grave danger to the public safety, and “a fertile field for communism, bolshevism and anarchy.” The contrary view would seem to be more sound. In the face of public danger, no matter of what character, the ties of government are always more closely knitted together. On the other hand the most fertile field for culture of revolutionary doctrine is found in the destruction of the confidence of the people in their institutions of government.
The crying need of this government of the people is that the great body of the people should take a more active, a more unselfish interest in politics; that they should study the problems of statecraft and give to the management of public affairs the same attention that they give to their private interests.
Primary elections, the initiative and referendum, and other popular governmental functions were designed to stimulate popular interest, and to attempt to eradicate political bossism, and who shall deny that substantial progress is being made ?
The constitution is the sacred product of the sovereign people, and as the mythical Minerva sprang into existence full grown from the brain of Jove, in like manner our very real constitution sprang full grown from the brain of the people, and neither *632 our courts nor our legislatures may cause it to increase or diminish. The people of Israel during their sojourn were for the most part subservient to Divine authority, but occasionally they felt strong enough to be independent of their Creator, and in each instance received well-merited chastisement. Each of the three departments of our government may well profit by this lesson from Holy Writ.