27 P.(2d) 991

**TODD v. TIERNEY, County Treasurer.**

**No. 3910.**

Supreme Court of New Mexico.

Nov. 4, 1933.

Rehearing Denied Dec. 12, 1933.

E. K. Neumann, Atty. Gen., Frank H. Patton, Asst. Atty. Gen., and J. D. Mell, Sp. Tax Atty., of Santa Fé, for appellant.

A. T. Hannett, of Albuquerque, and W. A. Sutherland, of Las Cruces, for appellee.

Hervey, Dow, Hill & Hinkle, of Roswell, J. O. Seth and E. R. Wright, both of Santa Fé, and J. D. Atwood, of Roswell, amici curiæ.

SADLER, Justice.

The appellant, as county treasurer of Bernalillo county, appeals from a decree of the district court of said county permanently enjoining him from conducting a sale of real property for delinquency in the payment of taxes for 1931 and 1932, under the provisions of chapter 171, New Mexico Session Laws of 1933, known as S. B. 144, Acts of the Eleventh State Legislature. It was an admitted fact in the case that appellant was the owner of real estate upon which taxes were delinquent for the years mentioned.

The act in question is a new and comprehensive Code for the enforcement and collection of delinquent taxes, prescribing the duties of county treasurers in relation thereto, providing for the sale of real property upon which taxes are delinquent, the issuance of deeds to purchasers, and fixing the means of securing redemption from sales thereunder. It carries the emergency clause authorized by the Constitution, in language as follows:

"That it is necessary for the preservation of the public peace and safety of the inhabitants of the State of New Mexico that the provisions of this Act shall become effective at the earliest possible time, and therefore an emergency is hereby declared to exist and this Act shall take effect and be in full force from and after its passage and approval." Section 44.

The sole attack upon the law, and the ground upon which its enforcement was sought to be enjoined, was that it had been suspended by the filing of petitions with the secretary of state within ninety days following adjournment of the Legislature, bearing the requisite number of signatures to require its submission to a vote of the people at the next general election, under the authority of section 1 of article 4 of the state Constitution, known as the referendum provision. The appellant by demurrer challenged appellee's position, and contended that the act assailed was within the class of laws expressly removed from operation of the aforesaid referendum provision. The basis of this contention is that the act is one providing for the preservation of the public peace, health, or safety, and that, the Legislature having so declared in the emergency clause attached thereto, the courts cannot review and impeach such declaration. The appellant having elected to stand upon the trial court's action overruling his demurrer, the injunction was made permanent, as hereinabove stated.

Actually, by its terms the order appealed. from permanently enjoins the appellant as county treasurer from selling property or acting under the law involved, seemingly irrespective of whether upon a referendum it shall be approved or rejected. Certainly it could not properly go further than to stay action pending the referendum except as contingent upon the result thereof.

We have thus squarely presented the question whether the courts may review the legislative declaration that a given act provides or is necessary for preservation of the public peace, health, or safety, in determining whether it is subject to, or exempt from, the referendum provided by the Constitution.

The referendum as it exists in this state is to be found as section 1 of article 4 of the Constitution, and reads as follows:

"The legislative power shall be vested in a senate and house of representatives which shall be designated the Legislature of the State of New Mexico, and shall hold its sessions at the seat of government.

"The people reserve the power to disapprove, suspend and annul any law enacted by the legislature, except general appropriation laws; laws providing for the preservation of the public peace, health or safety; for the payment of the public debt or interest thereon, or the creation or funding of the same, except as in this constitution otherwise provided; for the maintenance of the public schools or state institutions, and local or special laws. Petitions disapproving any law other than those above excepted, enacted at the last preceding session of the legislature, shall be filed with the secretary of state not less than four months prior to the next general election. Such petitions shall be signed by not less than ten per centum of the qualified electors of each of three-fourths of the

counties and in the aggregate by not less than ten per centum of the qualified electors of the state, as shown by the total number of votes cast at the last preceding general election. The question of the approval or rejection of such law shall be submitted by the secretary of state to the electorate at the next general election; and if a majority of the legal votes cast thereon, and not less than forty per centum of the total number of legal votes cast at such general election, be cast for the rejection of such law, it shall be annulled and thereby repealed with the same effect as if the legislature had then repealed it, and such repeal shall revive any law repealed by the act so annulled; otherwise, it shall remain in force unless subsequently repealed by the legislature. If such petition or petitions be signed by not less than twenty-five per centum of the qualified electors under each of the foregoing conditions, and be filed with the secretary of state within ninety days after the adjournment of the session of the legislature at which such law was enacted, the operation thereof shall be thereupon suspended and the question of its approval or rejection shall be likewise submitted to a vote at the next ensuing general election. If a majority of the votes cast thereon and not less than forty per centum of the total number of votes cast at such general election be cast for its rejection, it shall be thereby annulled; otherwise, it shall go into effect upon publication of the certificate of the secretary of state declaring the result of the vote thereon."

The first petition authorized, as will be noted, must be signed by not less than 10 per centum of the qualified electors of each of three-fourths of the counties and in the aggregate by not less than 10 per centum of the qualified electors of the state, as shown by the total number of votes cast at the last preceding general election. This petition may be filed at any time not less than four months prior to the next general election. The second petition authorized must bear signatures of not less than 25 per centum of the qualified electors under each of the foregoing conditions, and must be filed within ninety days following adjournment of the Legislature. In order to avoid useless repetition, and yet distinguish the two petitions, in this opinion we shall refer to petitions as signed either by 10 or 25 per centum of the qualified electors, as the case may be, without mentioning the other conditions attaching thereto, although a statement of such conditions is to be implied in each reference.

In Hutchens v. Jackson, 37 N. M. 325, 23 P.(2d) 355, 361, the question presented was whether the courts can go behind and overturn the legislative declaration of an emergency made in constitutional form, for the purpose of denying immediate effect to an act. We held the courts to be without such power, and, after an extensive review of the authorities, said: "It follows from what has been said that the trial court was correct in refusing to go behind the legislative declaration of an emergency contained in the act in question. That determination was final and conclusive and binding upon the courts."

But added: "It does not necessarily follow, and we are far from intending to suggest, that the same conclusiveness we accord to the leg-

islative declaration in this case, involving only the immediate or postponed effect of the statute, is to be given such a declaration as precluding an attack by referendum, when the latter question shall be properly before us."

Our purpose in thus guarding against any misapprehension of the effect of our decision in the Hutchens Case was prompted by the fact that in such opinion we cited as authority and reviewed many cases wherein the courts declined to go behind the legislative declaration that a given act was a safety measure, even though the purpose of the claimed test was to determine its exemption from the referendum. It impressed us then, and still does, that courts giving finality to the legislative declaration in such cases, where the question involved was the important one whether the people had on a given measure reserved or denied to themselves the right of referendum, were high authority upon the somewhat analogous question whether it should be given finality as bearing upon the immediate or postponed effect of the act.

It would have been improper for us in the Hutchens Case to attempt by pure obiter dictum to foreclose or prejudge the case of the referendum now before us for the very potent reason that no such question was involved or presented. But, even had we felt disposed to indulge in dicta arguendo, as appellate courts are at times prone to do in the perhaps mistaken belief that strength is thereby added to positions taken, the effect of the differences, though slight, in phraseology of the referendum and emergency provisions of the Constitution, and the force of other arguments, not then pursued, coming to mind as applicable to a referendum case and not pertinent to a decision in the Hutchens Case, caused us to feel that the effect of the referendum decisions there cited might, when we should come to construe the referendum provision of our Constitution, be deemed without the force possessed in their application to the case then being considered.

In our hearing of the present appeal the distinction between the two cases has been strongly presented. The differences in the language of the two constitutional provisions have been stressed. We have had the benefit of illuminating arguments by able counsel, some appearing amici curiæ, giving a clear exposition of their respective positions. We have given these arguments the most careful consideration, mindful of the importance and far-reaching effect of our decision, and have reached the conclusion that the right here asserted has not been reserved to the people, but, on the contrary, has been committed *by the people themselves* to a body of their own creation, the Legislature.

In view of the restrictions thrown around the exercise of the right of referendum, with particular reference to the somewhat high percentage and geographical spread of signatures required on a petition designed to prevent the operation of a law pending referendum, and the further requirement that the majority for rejection must be at least 40 per centum of the total votes cast at such election, we should be slow to deny the right claimed by so large a body of our voting citizenry unless based upon an abiding convic-

tion that the reserved power asserted does not exist. That conviction we entertain.

We turn, first, to a comparison of the language of the referendum and emergency provisions of the Constitution. Section 1 of article 4 reserves to the people the power to disapprove, suspend, or annul any law enacted by the Legislature, *except*, among others, "laws providing for the preservation of the public peace, health or safety." Section 23 of article 4 provides that laws shall go into effect ninety days after adjournment of the Legislature enacting them, except general appropriation laws which shall go into effect immediately upon their passage and approval. But this section further provides: "Any act necessary for the preservation of the pub· lic peace, health or safety, shall take effect immediately upon its passage and approval, provided it be passed by two-thirds vote of each house and such necessity be stated in a separate section."

Thus we find two things must concur to enable the Legislature to give immediate effect to an enactment. It must pass each House by a two-thirds majority, and there must be a legislative declaration in a separate section that it is necessary for the preservation of the public peace, health, or safety. For the purpose of determining the effective date of the same act here involved, we held in Hutchens v. Jackson, that the courts are powerless to concern themselves with the factual truth or reality of that declaration.

Facing the fact of the decision in that case and its effect as determining that the very law involved was given immediate effect by attaching the emergency clause, counsel for appellee contend, nevertheless, that it was automatically suspended upon the filing with the secretary of state of a referendum petition signed by 25 per cent. of the qualified electors in three-fourths of the counties of the state. In awarding a permanent·injunction, the lower court necessarily concluded both that the law was referable and that the petition filed had the suspensory effect claimed for it. Upon no other theory can the decree of the lower court be explained. Passing for the moment a discussion of the referable character of the law, except as that question may be deemed interwoven with a consideration of its suspensibility, we shall at this point determine whether, fairly considered, the language of the referendum provision in our Constitution contemplates the suspension by petition of any law already given effect.

When we come to analyze the referendum provision, we find it operates in two ways dependent upon the timeliness of filing the petition and the number or percentage of signatures attached thereto. If it is a petition bearing the signatures of 10 per cent. of the qualified electors, and be filed not less than four months prior to the next general election after adjournment of the Legislature, it merely operates to invoke the referendum and require submission. It has no effect to suspend operation of the law in the meantime.

But what is the result if rejected at the polls? In such event,·the Constitution says: "It shall be annulled and *thereby repealed*

with the same effect as if the legislature had *then* repealed it, and such *repeal* shall revive any law repealed by the act so annulled; otherwise, it shall *remain* in force unless subsequently repealed by the legislature." (Italics ours.)

On the other hand, if the petition be signed by 25 per cent. of the qualified electors and filed with the secretary of state within ninety days after adjournment of the Legislature at which the questioned law was enacted, the Constitution says: "The operation thereof shall be thereupon suspended and the question of its approval or rejection shall be likewise submitted to a vote at the next ensuing election."

It is urged upon us that the use of the language "the operation thereof shall be thereupon suspended" furnishes indisputable proof of an understanding by the framers of the Constitution that enactments bearing the emergency clause were not necessarily excluded from the referendum. For, they inquire, what laws other than those with the emergency clause can be the subject of suspension any time within ninety days after adjournment of the Legislature? If the language quoted stood alone, the argument advanced would have much force. But, construing all of the language of the provision together, as we must, and giving due weight to other considerations presently to be mentioned, we are satisfied the quoted phrase does not evidence the intent ascribed to it by counsel.

For instance, let us pursue the provision to its end and ascertain what results are contingent upon the rejection or approval of the law upon submission. It continues: "If a majority of the votes cast thereon and not less than forty per centum of the total number of votes cast at such general election be cast for its rejection, it shall be *thereby annulled;* otherwise, *it shall go into effect* upon publication of the certificate of the secretary of state declaring the result of the vote thereon." (Italics ours.)

This reflects strongly the view of the framers that the particular law thus approved by the electorate had never theretofore been in effect. For how can a law "go into effect" that has already been in effect. Observe the language does not say "shall go into effect *again*," or shall "resume effect," or "shall cease to be in suspense," but "shall go into effect," thus leaving the impression that, in the view of the framers of the Constitution, at least, the measure had never been "in effect."

But this is not the only consideration leading to the conclusion that the petition signed by 25 per cent. of the qualified electors was not intended to suspend the operation of a law already placed in effect; and that the distinctive purposes of the two petitions were, in the one case, to permit the repeal by referendum of a law already in effect, and, in the other case, to prevent an enacted law from coming into effect pending a referendum thereon.

As to the effect of rejection at a referendum initiated by a petition signed by 10 per cent. of the qualified electors, the framers of our organic law were careful to say that it

should be "annulled and thereby *repealed* with the same effect as if the legislature had *then* repealed it." No such concern or solicitude is evidenced for the protection of rights arising under a rejected law theretofore in effect, but whose operation is "suspended" by the filing of a petition signed by 25 per cent. of the qualified electors. On the contrary, upon the rejection of such a law, the Constitution declares "it shall be thereby annulled." Proceedings thus initiated within ninety days after adjournment of the Legislature, if successful, *repeal* no law. They operate, on the contrary, to *annul* a law. Webster defines "annul" as meaning "to reduce to nothing; to obliterate" and "to make void or of no effect; to nullify; to abolish; to do away with."

If it be suggested that the word "annulled" is employed in a narrower sense in declaring the effect of the rejection of a law referred under petitions bearing signatures of only 10 per cent. of the qualified electors, and hence cannot here have so broad a meaning as we attribute to it, the answer is that the restricted meaning there intended is manifested by the words immediately following its use. The provision reads that upon rejection the law "shall be annulled and *thereby repealed* with the same effect as if the legislature had *then* repealed it." Whereas the alternative to rejection stated immediately following the use of the word in declaring the effect of a law suspended by petition filed within ninety days after adjournment of the Legislature demonstrates just as strongly that the word is used in its broadest significance. If rejected, the law "shall be *thereby annulled;* otherwise it

shall *go into effect* upon publication of the certificate of the secretary of state declaring the result of the vote thereon." It does not provide, as in its earlier use, that it shall be "annulled and thereby repealed" as of the date of the election, or as of the date of its suspension, if in fact it has ever theretofore been in effect, or that it shall be deemed *repealed* at all, but, on the contrary, that it shall be "thereby annulled." But, if instead of rejection it receives approval, "it shall go into effect" upon publication of the designated certificate of the secretary of state.

An examination of the referendum provision discloses two other significant circumstances. The first is the absence of authority for filing petitions during the legislative session designed to suspend operation of a law placed in immediate effect by use of the emergency clause. The provision reads: "Petitions disapproving any law *other than those above excepted*, enacted at the *last preceding session* of the legislature, shall be filed with the secretary of state not less than four months prior to the next general election."

And, if the petition be signed by 25 per cent. of the qualified electors, and be directed to a law passed at the "last preceding session" of the Legislature, it must be filed within ninety days "*after adjournment* of the legislature."

It is somewhat singular, if the last-mentioned petitions were intended by the Constitution to suspend operation of a law already effective, that it would not have conferred the right to bring about that suspension at the earliest moment the required number of signatures could be obtained, even if that time

be during the very session enacting the questioned law.

In the second place, if within contemplation of the framers of the Constitution the right to suspend an existing effective law was to be conferred, why confine such right to a period of ninety days following adjournment of the Legislature? The longer a pernicious law operates, the greater the harm and evil which may flow therefrom. But a mere reading of the language of this provision cannot fail to impress that significance is attached to fixing as the dead line the ninetieth day after adjournment of the Legislature. The provision seems pointed to the ninetieth day. Why? Because it is upon that day that all laws not bearing the emergency clause, enacted at the last preceding session of the Legislature, become effective under another provision of the Constitution, section 23 of article 4.

The framers of the Constitution were thus careful to withhold the right to file petitions during the current session of the Legislature, the only purpose to be subserved by which would be to bring about an earlier suspension of a law already effective. They were careful to confine the suspensory effect of petitions bearing signatures of 25 per cent. of the qualified electors to the ninetieth day following adjournment of the Legislature, the effective date of all laws not given immediate effect by emergency declarations. And were just as careful to say that laws rejected under petitions filed after the ninetieth day from adjournment should be deemed merely *repealed* as of the date of their rejection at the polls, and not wholly abrogated.

Nor can we say that this studied concern and provision against the abrogation and nullification from its inception of a law given operative effect over an indefinite period following enactment was not fully warranted. As is well known, rights arise very quickly under duly enacted laws following their effective dates. Commercial and business transactions of the highest importance may be consummated; descent may be cast; testamentary dispositions made; family and personal relations become altered and valuable property rights acquired or changed, all upon the faith of laws in full force at the time of such transactions, yet later suspended under referendum petitions, and finally annulled through rejection at the polls.

The repeal through a referendum of a law previously in effect some seventeen months works no hardship or injustice, for until repeal it is a valid, existing law. Acts done and rights acquired thereunder are protected. Neither is the public interest prejudiced nor are private rights imperiled through the suspensory effect of petitions filed within ninety days after adjournment of the Legislature, thereby preventing an enacted measure from actually becoming a law. Rights could not be acquired, nor acts lawfully done under such an enactment. For it never was a law, nor will ever be, until after a favorable vote of the people and publication of the certificate of the secretary of state, declaring the result of the vote, whereupon "it shall go into effect." It then for the first time becomes a law.

Most, if not all, of the cases holding that the courts have a right to review a legislative

declaration of emergency proceed upon the theory that the Legislature is powerless to give immediate effect to a referable law. The decisive question thus becomes: When did the law take effect? If it had immediate effect (and the decision whether it did is based upon the Legislature's power as distinguished from its effort to give it such effect), its non-referable character is conclusively established.

In State ex rel. Westhues v. Sullivan, 283 Mo. 546, 224 S. W. 327, 335, one of the cases relied upon by counsel appearing amici curiæ, the controlling influence of this consideration is clearly pointed out in the opinion by Mr. Justice Graves, as follows: "That an act may take effect under a general emergency clause, and yet be subject to the referendum, is clearly contrary to the intent of the amendment, and would produce disastrous results. The clause in the amendment which reads, 'Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise,' clearly means that a law upon which the referendum is invoked cannot take effect prior to its approval by the vote; and consequently no act that is subject to the referendum can be made to go into operation for 90 days after the adjournment of the session or its approval by vote."

In Arkansas Tax Commission v. Moore, 103 Ark. 48, 145 S. W. 199, 201, the court was dealing with a constitutional referendum provision which excepted from its operation only "laws necessary for the immediate preservation of the public peace, health or safety." The court held the question of necessity to be one exclusively for legislative determination, and that such determination alone could bring it within the exception and power of the Legislature to give it immediate effect and thus remove it from the general class of laws upon which the people reserved the right to order the referendum. In its opinion this court also gives decisive consideration to the effective date of the law as placing it within or without the referendum. It said:

"Under this initiative and referendum amendment, only 'laws necessary for the immediate preservation of the public peace, health or safety' are excepted from its provisions, and no power is reserved by the people to pass directly upon such laws. All other laws are subject to its operation; and, 90 days being given by its terms from the final adjournment of the session of the Legislature which passed them in which to demand or order the referendum thereon, they cannot take effect or go into operation till the expiration of 90 days after such adjournment, nor thereafter until approved by the people, if the referendum is ordered or invoked.

"It was not intended that an act passed by the Legislature should take effect conditionally and subject to the referendum, and continue in force from its passage, if the referendum was not ordered, or that an act once in force should be suspended by the referendum till its approval by the people."

The "disastrous results" which the opinion of the Missouri Supreme Court in the Sullivan Case apprehends would be produced would become a living reality in New Mexico, should we hold that the operation of a law

already in effect could be suspended by the referendum. We already have held in Hutchens v. Jackson, supra, that the very law now before us was placed in immediate effect upon its passage and approval by the emergency declaration carried as one section thereof. That effectiveness continues to date unless suspended by the filing of the referendum petitions involved in this appeal.

Giving due weight to all of the considerations mentioned, we are unable to see in the phrase "the operation thereof shall be thereupon suspended," used in declaring the effect of filing the petitions prescribed within ninety days after adjournment, an intendment or understanding on the part of the framers of our Constitution that the power to suspend a law already in effect had been conferred.

Nor, standing alone, would the use of this language necessarily carry the meaning urged for it. A measure duly passed by the Legislature and approved by the Governor is not wholly without operative effect, even though not declared emergent. It has constantly increasing potentiality toward complete effectiveness as a law. Nothing but the end of time or the filing of the referendum petition required within ninety days after adjournment of the Legislature enacting it can prevent it becoming a law at a time certain. From the day of its enactment such a measure through the agency of passing time is operating toward a given effective date. The filing of the petition now discussed automatically places the measure in suspense, postpones its possible effective date to the time of the next general election, and interposes a new condition to its ever becoming a law;

namely, a vote of approval in such election. It is in this sense only that operation of the law is suspended. Its operation as a potential, impending law, not as an effective, existent law, is suspended.

■ The people having thus studiously refrained, as we hold, from reserving to themselves the power to suspend by referendum petitions the operation of any law already given immediate effect through an emergency declaration, what weight is to be attached to this significant circumstance? Upon this question the members of the court do not see alike. Mr. Chief Justice WATSON and Mr. Justice ZINN are in agreement with Mr. Justice HUDSPETH and the writer of this opinion that the claimed power to suspend does not exist. But they attach no peculiar significance, as do we, to the circumstance that the Legislature is permitted by the Constitution to give immediate effect (and thus place beyond the power to suspend), only to that class of laws, i. e., safety measures, which the same instrument expressly exempts from the referendum. Mr. Justice BICKLEY, while disagreeing with all of us in our conclusion that the power to suspend does not exist, holds with Mr. Chief Justice WATSON and Mr. Justice ZINN that the referable character of the law is still open for determination by the courts, even though suspension pending referendum be denied.

■ What the framers of the Constitution intended as disclosed by the language employed is, of course, the interpretation properly to be given the instrument. That intent must be arrived at by construing together its various pertinent provisions and giving to each the

meaning which its language most naturally suggests when considered in proper relationship to the others. We should, as nearly as we may, endeavor to look at the instrument from the vantage point of the framers the better to understand their view of the matter and the meaning likely intended. And certainly no proper construction can be adopted which fails to attach proper significance to the practical sameness of the language employed in exempting from the referendum laws *"providing* for the preservation of the public peace, health or safety" as that used in authorizing the Legislature to give immediate effect to laws *"necessary* for the preservation of the public peace, health or safety."

As bearing upon the framers' then view of the matter, we must credit them with an assumption that the use by the Legislature of the emergency clause would not be abused. They circumscribed its use by the requirement that at least two-thirds of the voting members of each house should concur in the declaration that the measure sought to be given immediate effect was in fact necessary "for the preservation of the public peace, health or safety."

We are unable to believe that the framers of our Constitution in stating the conditions upon which an emergent measure might be given immediate effect were devising a mere formula for ready use, irrespective of the realities. We cannot feel that they considered the emergency provision, although a resounding phrase worthy of a great purpose, as a mere rhetorical flourish wanting in intended use commensurate with the solemnity of expression and weightiness of diction employed.

We think the framers took a different view of the matter. If they believed, and had a right to believe (and we insist that they did and that we must so assume), that the emergency clause would be used to place in immediate effect *only* such laws as were *actually* necessary for preservation of the public peace, health, or safety, and shown so to be by a two-thirds vote in each house, then the declaration was not to be made for any purpose apart from the referable character of the law, but, when made in good faith, as the framers had a right to expect it should ever be, is made for the sole purpose of giving immediate effect to a law of the very kind declared by the Constitution to be exempt from referendum.

If we can or should assume as meaningless or foreign to its stated purpose the use of this high-sounding phrase by the framers in describing the kind of laws which could be given immediate effect, then our argument fails. But, mindful that the Constitution itself gives immediate effect to but one kind of law, i. e., general appropriation bills, and gives it into the hands of the Legislature to give immediate effect to laws of but another single class, i. e., safety measures, "laws necessary for the preservation of the public peace, health or safety," we are unable to believe that the framers dissociated in their minds the kind of laws which could be given immediate effect from the kind they had exempted from the referendum. They must have considered that any law which a good-faith exercise of the power to make emergent had

given immediate effect fell within the class of exempted laws. And we must assume they expected a good faith exercise of the power to make emergent. Either that or concede they were using solemn and high-sounding phrases, carrying an entire emptiness of meaning.

Furthermore, the view that the emergency provision is a mere formula furnished the Legislature by the Constitution to enable it to give immediate effect to legislation without necessary regard to its referable character seems to ignore the circumstance that under the language of the Constitution the sole and only condition which can make the immediate effectiveness of a law desirable is the *fact* of its necessity for preservation of the public peace, health, or safety. It subordinates and renders secondarily important the paramount fact the existence of which is indispensable before the legislative judgment upon the timeliness of an act's effective date is even invoked. This construction as we feel "lets the tail wag the dog."

Is it not passing strange, if the framers of the Constitution in their deliberations did not carefully correlate the emergency and referendum provisions of the Constitution, and regard the former with the seriousness which its language imports, that the members of this court in deciding the question before it have been compelled to devote so much time and discussion to a proper analysis of these two provisions and an exposition of their correlative or distinctive functions, as the respective view may be.

We are satisfied that the emergency provision was inserted as section 23 of article 4 solely to enable the Legislature to give immediate effect to the very kind of laws and none other declared in section 1 of article 4 to be exempt from the referendum. And we think when the framers wrote in section 23 of article 4 they neither ignored, forgot, nor were oblivious to the significant circumstance that the language being used to state the condition for giving immediate effect to a law was practically identical with, and necessarily embracive of, that employed in the same article only a short time previously for stating the condition exempting a law from the referendum.

We have spoken often in this opinion of the viewpoint of the framers of the Constitution and of what they intended by the language employed. And whenever we refer to the framers that term is to be taken as embracing the people who adopted it. We are not unmindful of the rule of construction applicable to a Constitution that its language is to be taken in its common and ordinary sense and as likely understood by the people who adopted it. But there is nothing here to suggest any different meaning for the language employed than that in which it is commonly and ordinarily understood, except in so far as the view is advanced that the emergency provision by reason of an acquired use as a formula was not employed by the framers in the seriousness which its language imports.

It can have had no such acquired use in New Mexico since prior to statehood our territorial Legislatures were unfamiliar with its use, being without occasion to employ it. And, if the framers did intend it only as a formula, as we assert they did not, but on the

contrary contemplated its bona fide use, the rule of construction mentioned enjoins that we should interpret it as the common, ordinary meaning of the language employed would give it understanding to the people adopting it.

So interpreting the referendum and emergency provisions of the Constitution in their relation to each other, and mindful of the condition imposed upon the use by the Legislature of the latter, i. e., a two-thirds vote in each house, the conclusion seems to us inescapable that the emergency declaration when made bears an intended finality. We hold that it does. It thus becomes perfectly obvious that the reason the Constitution so carefully guards against suspension by referendum petitions of laws already in effect is due to a conception on the part of its framers that the essential fact whose existence the Legislature alone can determine, when found and declared by it, would automatically place the law involved in a class exempted from the referendum.

We think it was not intended by the Constitution that there should ever be a referendum upon any measure given immediate effect by the Legislature as necessary for the preservation of the public peace, health, or safety. We hold further that a measure bearing the legislative declaration that it is *necessary* for the purposes named must by the courts be conclusively presumed to *provide* for such purpose. A law may reasonably provide for preservation of the public peace, health, or safety without being necessary to their preservation. But we can conceive of no law as being necessary to their preservation without providing therefor.

And this brings us to another argument advanced by counsel for appellee and those appearing amici curiæ. It is urged, as we have just suggested, that, since laws providing for the public peace, health, or safety are excluded from the right of referendum, an attempt might be made to refer such a law not bearing the emergency clause; that, if such attempt were resisted, it would clearly become the duty of the courts to pass upon and determine whether or not subject to the referendum. And along the same line our attention is called to the fact that all laws excluded from the referendum are listed together in the same paragraph of the Constitution, i. e., general appropriation laws; laws providing for the preservation of the public peace, health or safety; for the payment of the public debt or interest thereon, or the creation or funding of the same; for the maintenance of the public schools or state institutions, and local or special laws.

What as to any of said laws (except general appropriation laws given immediate effect upon passage by the Constitution itself) not bearing the emergency clause when drawn in question, ask counsel? Would the courts not be called upon, they inquire, to say, for instance, whether a given act does "provide" for payment of the public debt, or for maintenance of the public schools or state institutions, or whether it is a local or special law? Is the mere omission of an emergency clause to expose to the referendum laws clearly excepted? And, if the law be one such as is

obviously excluded, would not the courts have the power so to declare?

We answer all of these questions affirmatively. It would be the duty of the courts, and they would have the power, under the contingency named, to pass upon and determine the question. But it is one thing for the courts to claim and exercise such power where the Legislature has remained silent and quite another thing to do so where the Legislature has spoken through a solemn declaration of emergent necessity. In any event, the "question" to be determined would be the legal one whether the act involved provided for the specified objective and was thus excluded from the referendum. The determination of that question, however resolved, would neither invade nor overturn a legislative finding and declaration of necessity made for the purpose of giving immediate effect to the law as a safety measure, thus placing it within a class of laws to which we hold the Constitution fairly interpreted gives a conclusive presumption of providing for the objects for which they have been declared necessary.

In arriving at these conclusions, it has not been necessary for us to go beyond a careful analysis of the language of our own Constitution. But, when we seek aid to proper construction from the decisions of other jurisdictions, we are confirmed in the conviction that the question presented is correctly decided. It is not our purpose in this opinion to enter upon an extended citation and review of the authorities. Practically every case of importance upon either side of the proposition will be found cited and discussed in Hutchens v. Jackson, supra, to which reference may be made for a collation of the authorities pro. and con.

We are quite satisfied that the weight of judicial authority holds final and conclusive and binding on the courts a legislative declaration that a given act is necessary for the preservation of the public peace, health, or safety, whether the question for determination be the immediate or postponed effect of an act or its exclusion from a referendum sought thereon. The earliest leading cases on either side of the proposition from the standpoint of their importance are Kadderly v. City of Portland, 44 Or. 118, 74 P. 710, 75 P. 222, holding the legislative determination final, and State ex rel. Brislawn v. Meath, 84 Wash. 302, 147 P. 11, supporting a right of review in the courts.

It is conceded by all that whether a given measure is necessary for the preservation of the public peace, health, or safety is a question of fact. And the authorities on both sides of the proposition agree that it is a factual question for legislative determination in the first instance. Repeatedly in the decisions is the query put: Who is to decide finally the question of necessity? And as often as. asked the fact is adverted to that the particular Constitution is silent as to which, the courts or the Legislature, shall have the final determination. The same is true of our Constitution. It is silent on the subject.

This circumstance alone should furnish the answer in this state to the question so often put. For section 1 of article 3 of our Constitution dealing with the distribution of powers between the three governmental departments.

·enjoins that: "No person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise *any powers* properly belonging to either of the others, except as in this constitution otherwise *expressly* directed or permitted." (Italics ours.)

The absence of an express bestowal of such power in the present instance is the fact just adverted to. Thus the courts would clearly be exercising a power properly belonging to the legislative department, in overturning the latter's solemn declaration that the necessity declared in fact exists without being able to find in the Constitution any express provision giving them the right thus to sit in judgment upon the exercise of this purely legislative function.

If the Legislature does not conceive, resolve, and indeed factually find that occasion exists to provide for preservation of the public peace, health, or safety, there will never be brought into being in the first instance any act purporting so to provide. There would be nothing to submit, if such a measure were subject to submittal.

Unquestionably, the Legislature must in the first instance make the factual finding of necessity. The question is: How conclusive is it? Is it under our scheme of government any less conclusive than its deliberate judgment evidenced by a failure to enact that occasion for so providing does not exist. From the latter there is no appeal, no right of review, nor a remedy, except in the ballot box. And there and there alone, under our Constitution as written, is

to be found the relief against a careless, an unwise, or even bad faith exercise by a Legislature of the power vested in it under the Constitution to declare measures emergent, and thus place them in a class of laws excluded from the referendum.

An argument frequently urged against the existence of this power in the Legislature is that it may be abused. Real or imagined instances of an absurd exercise of the power are often cited in support of the contention that bestowal of such power was not intended. The answer to such argument is to be found in the uniform holdings of this and other courts that it is no test of the existence of a power to assert that it may be abused. Hutchens v. Jackson, supra.

The fact that the chief executive of a state or the nation could do the wholly unthinkable yet conceivably possible thing of pardoning every prisoner confined in the penal institutions within his jurisdiction does not argue even persuasively that the executive is or should be without the constitutional power to pardon. The people in their organic law have conferred and distributed powers upon the necessary hypothesis that the donees thereof will act as honest, normal, reasonable human beings in the execution of those powers. Upon no other basis can the regulation of human affairs be provided for.

While disagreeing with the conclusion of our brethren of the court, comprising a majority, on the effect to be given the legislative determination of necessity, we have not failed to give their ably presented views, for which we have always the highest regard, our most serious consideration. But,

for the reasons given, we feel the nonreferable character of the law is conclusively established by the solemn legislative declaration that it is necessary as a safety measure.

The resultant of our opinions as a whole leaves still open the question whether this statute is of the referable class within the meaning of article 4, § 1. It must remain open for the present for two reasons: First, an answer is not necessary to the decision of this injunction case which falls with the holding that the statute was actually in effect and had not been suspended; second, the points and arguments of counsel do not cover the question, appellant having rested content with the proposition that the legislative declaration is conclusive.

According to the views of the majority, as herein and herewith expressed, the judgment appealed from should be reversed and the cause remanded, with a direction to the trial court to sustain appellant's demurrer and dismiss the complaint.

It is so ordered.

HUDSPETH, J., concurs.

ZINN, Justice (specially concurring).

Mr. Justice SADLER holds that a petition, though bearing signatures of not less than 25 per centum of the qualified electors, cannot operate to suspend a law in force and effect. With this conclusion I concur.

With the conclusion reached by him that, because such petition cannot suspend the operation of a law in effect, it must necessarily follow that a referendum petition directed against a legislative act bearing the emergency clause is entirely ineffectual, I cannot agree.

Justice SADLER adopts the Oregon theory as held in the case of Kadderly v. Portland, 44 Or. 118, 74 P. 710, 75 P. 222, and which theory is followed in other states. See In re Menefee, 22 Okl. 365, 97 P. 1014; Hanson v. Hodges, 109 Ark. 479, 160 S. W. 392, 395; Van Kleeck v. Ramer, 62 Colo. 4, 156 P. 1108; State v. Bacon, 14 S. D. 394, 85 N. W. 605; Sutherland v. Miller, 79 W. Va. 796, 91 S. E. 993, L. R. A. 1917D, 1040; Orme v. Salt River Valley Water Users' Ass'n, 25 Ariz. 324, 217 P. 935; State v. Smith, 102 Ohio St. 591, 673, 133 N. E. 457, 480. Also see notes in 50 L. R. A. (N. S.) 206; L. R. A. 1917D, 1046; 7 A. L. R. 519 and 530.

An exhaustive search which we deem unnecessary would probably disclose other states in accord with the Oregon view.

The so-called "Oregon" theory is simply this: That a legislative declaration in the "emergency clause" that the act is necessary for the preservation of the public peace, health, and safety of the inhabitants conclusively makes such a law necessary for the preservation of the public peace, health, and safety of the inhabitants, and is beyond review of the courts, and such emergency declaration deprives the people of their reserved power of referendum.

As I view it, the basic theory upon which the case of Kadderly v. Portland, supra, is founded, is the rule adopted in holding that

the declaration of an emergency by the Legislature to give an act immediate effect is conclusively binding on the courts. I adhere to this basic rule. It does not necessarily follow that, because the formula for putting a law into immediate effect required the Legislature to use the phrase "That it is necessary for the preservation of the peace, health and safety of the inhabitants," conclusively means that a law so enacted does provide for the preservation of the peace, health, and safety of the people. That the Kadderly Case is founded on the same rule we followed in the case of Hutchens v. Jackson, 37 N. M. 325, 23 P.(2d) 355, I quote from the Kadderly Case:

"In State ex rel. v. Bacon, 14 S. D. 394, 404, 85 N. W. 605, the court say in referring to this amendment: 'It will be observed that the law of 1901 which we are considering not only declares that an emergency exists, but also that the "provision is necessary for the immediate preservation and support of the existing public institutions of this state." It seems to have been uniformly held under Constitutions containing an emergency clause, and providing that laws containing such a clause shall take effect as therein directed, that the action of the Legislature in inserting such a clause is conclusive upon the courts. (Citing authorities.) *No reason occurs to us why the same rule should not apply to the act in question.* The Legislature having declared that the provisions of that act are necessary for the immediate preservation and support of the existing public institutions of the state, that declaration is conclusive upon this court, and brings

this class clearly within the exception contained in section 1 (as amended) of article 3 of the Constitution.'" Kadderly v. Portland, 44 Or. 118, pages 149 and 150, 74 P. 710, 721, 75 P. 222.

I italicized the statement which shows conclusively the underlying reason for the Oregon rule. That is the premise from which the Oregon court in the Kadderly Case started, and therefore they reached an illogical conclusion. I do not concede that premise to be correct, and the reasons are ample why the same rule we followed in the case of Hutchens v. Jackson, supra, does not apply in the instant case. I readily distinguish the different purposes of section 1 and section 23, art. 4, of our Constitution, and I cannot see where our recent pronouncement in the Hutchens v. Jackson Case, supra, varies the conclusion I here reach.

This same conclusion as to the illogical result in the Kadderly Case is expressed by the Supreme Court of Montana. The court said:

"We believe the learned justice who wrote the opinion based his conclusion on a false premise; he argues that because the question is a question of fact, and the authority to determine that fact rests 'somewhere,' and the Constitution has not conferred it upon any tribunal, it must necessarily rest with the Legislature. If the reasoning was sound, it would apply with equal force to questions arising as to whether acts were in violation of the state Constitution, and on the passage of local and special laws on the prohibition subjects; for here also 'the authority to determine it must rest somewhere,' and 'the

Constitution does not confer it upon any tribunal.'

"We are also convinced that the learned writer of that opinion fell into the error of confounding the question involved with that in the decisions dealing with enactments under which the emergency clause did no more than to abridge the time within which laws should take effect." State v. Stewart, 57 Mont. 144, 187 P. 641, pages 643 and 644.

The Kadderly Case and those following it started with a premise which in my view has no application to the question presented, and which I do not care to blindly follow, and thereby hold that the people are deprived of their reserved powers of referendum.

Whether it is necessary that legislation be given immediate effect is for the Legislature. The courts would be usurping and exercising a power properly belonging to the legislative branch to attempt to review that question. But it is the duty of the court when a matter is properly presented to determine from the four corners of the act whether it is a law providing for the preservation of the public peace, health, or safety, or for the payment of the public debt or interest thereon, or the maintenance of the public schools, or is one of the excepted laws contemplated by article 4, § 1, and is freed from the operation of the referendum, and no legislative declaration that a law is one of the excepted laws is binding upon the courts.

Those states which follow or adhere to the opposite theory as expounded by the Supreme Court of Washington in the case of State ex rel. Brislawn v. Meath, 84 Wash. 302, 147 P. 11, though often criticizing the rule of reasoning which is the basic rule upon which the Oregon theory is founded, do not dissociate the two provisions or attempt to distinguish the powers. Some are based on the express provision of their Constitution which prohibits the Legislature from attaching the emergency clause to a referable law.

It is noticeable that in many of the state Constitutions there is a provision that a law which is subject to the referendum cannot be given immediate effect. There is no limitation of that kind in our Constitution, which evidences an intention not to limit the Legislature in the use of the emergency clause, and as to the conclusiveness of such a declaration of emergency to give a law immediate effect we need not concern ourselves at this time, having already decided that question on June 10, 1933, respecting the very statute here in issue, in Hutchens v. Jackson, supra.

By most constitutional provisions, as is true in our state, laws necessary for the immediate preservation of the public peace, health, or safety are excepted from the operation of the referendum. In some states, as in New Mexico, the Legislature is given power by the use of the emergency clause to have an act passed by it take effect at once. The similarity of the language in the formula prescribed by the Constitution for the latter purpose, and the constitutional description of laws excepted from the referendum has caused this confusion. I separate the ques-

tions and consider the right to declare an emergency as a right conferred upon the Legislature. It is a matter separate from the limitation upon the people's right of referendum which excepts a law from the operation of the referendum.

It is not necessary to read section 1 into section 23, or vice versa. They are distinct powers, and have a different purpose and have no relation to each other. The power to give immediate effect to legislation was intrusted to the Legislature by the people, and we have sustained its right in the exercise of this power. Hutchens v. Jackson, supra. But the people have reserved to themselves the power to repeal acts of the Legislature, with certain exceptions, and it is our duty to sustain that power, and likewise determine the exceptions.

In the case of Hutchens v. Jackson, supra, when we referred to laws "necessary for the preservation of the public peace, health and safety," we referred to the formula known as the emergency clause, being the provision referred to in section 23, and nothing else. In other words, the use of the term "emergency," as used in Hutchens v. Jackson, supra, means a situation calling for the immediate operation of the law and has no relation to a law within the police powers of the state which is excepted from the operation of the referendum. This difference and distinction is of vital importance in considering the question.

The power of the Legislature to declare an emergency for the purpose of giving immediate effect to a law is an entirely different power from the one determining that only laws of a certain class shall be subject to the referendum. The clear purpose of the exception from the referendum of laws providing for the peace, health, and safety of the people is to preserve unimpaired the right of the Legislature to exercise the police power so far as it may be emergent without the uncertainty of the result of a referendum, which laws are by their very nature emergent. Since the court exercises jurisdiction to determine whether an act of the Legislature is a valid exercise of the police power, it must be a judicial question whether the exercise by the Legislature of certain phases of that power which are selected and made an exception to the constitutional guaranty of the referendum is a valid exercise of the power. No court can consistently say that a legislative declaration, "This law is a law enacted as one within the police powers of the State," makes such declaration conclusive upon the courts, and therefore not subject to review.

Because of this hopeless conflict in other jurisdictions, the interpretations given to this subject in other states are of value merely as an aid in reasoning, but not as precedent or authority. In fact, the courts of other jurisdictions are as hopelessly divided as we are, and the different views are as hard to reconcile.

We must necessarily look to our own Constitution and from it determine the question, and in considering the same, with a view to its interpretation, the thing which we are to seek is the thought which it expressed to the people of New Mexico, who ratified it. Its meaning is to be found in the minds of its makers who are the people who adopted it.

Its language is their language, and words employed therein must be given a meaning as they understood them. It is our duty to determine what the plain citizen intended when he voted to adopt the Constitution.

Says Mr. Justice Story: "Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness of judicial research. They are instruments of a practical nature, founded on the common business of human life, adopted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." 1 Story, Const. § 451.

We must give the subject a common sense and plain interpretation to carry out the intention of the plain people who adopted it.

As an example of what I mean by a common sense or plain construction, I refer to the recently repealed article 23 of our Constitution, which prohibited within this state the manufacture for sale, barter, or gift of any ardent spirits, ale, beer, alcohol, wine, or *liquor of any kind whatsoever containing alcohol.*

No one would contend that vanilla extract is not a "liquor" and no one would contend that it was not a "liquor containing alcohol," but only by exacting critical propriety and literal construction could we say that the people when they adopted article 23 intended to prohibit the manufacture, sale, barter, and gift of vanilla extract. The people had in mind the "liquors" that were sold in saloons and not those sold in grocery stores.

The same common sense reasoning is applicable here.

Now, then, what did the people understand to be the meaning of section 23? What did they understand as to section 1?

Not necessarily what niceties of expression were employed by the lawyers who drafted the Constitution.

N. M. Const. art. 4, deals generally with the "Legislative department." Section 23 deals with the subject of the time when laws shall take effect. Section 1 refers to the reserved power of referendum, enumerating the exceptions and describing the methods to be employed to invoke such reserved powers.

For years before the adoption of the Constitution, and to this very day, the Legislatures where such provision as our section 23 was in effect, as well as the plain people, understood the purpose of an "emergency clause" to be the means by which a Legislature could give immediate effect to a law which the Legislature deemed necessary to put into immediate effect. For example, it might become necessary or emergent that another district judge be added in some large judicial district because of the congestion of business. A bill is introduced to which is added the clause which is generally known and accepted as the "emergency clause," and if such law receives a two-thirds vote of both Houses and is approved by the Governor,

then such a law becomes immediately effective. This particular clause in actual practice is universally known as the *emergency clause*. It is a mere formula. The Legislature so considers it, and the people have so understood it.

Whether it is either expedient or necessary that an act go into immediate effect is for the Legislature to determine, and such declaration is conclusive upon the courts. Hutchens v. Jackson, supra. But whether a law provides for the preservation of the peace, safety, and health of the people is for the courts to determine.

Now what of section 1?

Our Constitution is different in form as to the reserved power of referendum from that of any other state Constitution. The North Dakota Constitution expressly provides for the result we here achieve. N. D. Const. § 25 (article 2).

As I interpret N. M. Const. art. 4, § 1, the people have reserved unto themselves two powers.

In order to distinguish and separate these powers, and for the purpose of visualizing and distinguishing one from the other, and by way of analogy, I have classified these two reserved powers in the people by article 4, § 1, as the power of "veto" and power of "repeal."

These two powers operate as to all laws except general appropriation laws; laws providing for the preservation of the public peace, health, or safety; laws for the payment of the public debt or interest thereon, or the creation or funding of the same, except as otherwise provided by the Constitution; laws for the maintenance of the public schools or state institutions, and local or special laws. These are the excepted laws, and as to these there is no reservation to the people either of the right of veto or right of repeal.

Whether the Constitution was framed in this manner intentionally or inadvertently I cannot say, but we must necessarily hold that there is no power reserved to the people to suspend the operation of a law which is in force and effect.

The power of veto is found in the reserved power of the people to suspend and annul. The machinery for exercising this power is through the extraordinary petition bearing the signatures of not less than 25 per centum of the qualified electors, which must be filed before the law goes into effect, in which event the operation of the law is suspended until the people at the next general election can approve or reject the same. The language of the Constitution is clear, and, as clearly demonstrated by Justice SADLER, the veto power with the machinery for the exercise thereof is not available as to laws in effect.

The Constitution is silent as to suspending laws in effect when a referendum petition is filed, and no provision is made that, upon the filing of the 25 per cent. petition, the suspension thus effected would reinstate and revive laws which the suspended law may have repealed.

However, though the power of veto may not exist in the Constitution as to laws in effect, the right of the people to repeal such a law, if a majority thereof decide in the affirma-

tive, is expressly there, and it is at this point where my views part with the views subscribed to by Justice SADLER.

This reserved power of the people to repeal a law, exclusive of the excepted laws, is exercised in the following manner:

Petitions shall be filed with the secretary of state not less than four months prior to the next general election. Such petitions shall be signed by not less than 10 per centum of the qualified electors of each of three-fourths of the counties, and in the aggregate by not less than 10 per centum of the qualified electors of the state, as shown by the total number of votes cast at the last preceding general election. The question of the approval or rejection of such law shall be submitted by the secretary of state to the electorate at the next general election; and, if a majority of the legal votes cast thereon,.and not less than 40 per centum of the total number of legal votes cast at such general election, be cast for the rejection of such law, it shall be annulled and thereby *repealed* with the same effect as if the Legislature had then repealed it, and such repeal shall revive any law repealed by the act so annulled; otherwise it shall remain in force unless subsequently repealed by the Legislature. See N. M. Const. art. 4, § 1.

This power is applicable to all but excepted laws, and the use of the emergency clause attached to a statute does not deprive the people of this right and power.

Whether the law under consideration comes within any of the exceptions specifically set forth in section 1, we are not called upon to decide at this time, and do not decide until our jurisdiction is invoked in an action between the proper parties.

Though agreeing that a law in effect cannot be suspended, I cannot agree with the expressed opinion of Justice SADLER that the emergency clause deprives the people of their reserved power of referendum.

WATSON, C. J., concurs.

WATSON, Chief Justice.

Having concurred in the opinion of Mr. Justice ZINN, I might forego individual expression. However, the importance of the question and the wide interest in the result may justify adding a word.

The people's reserved power is to "disapprove, suspend and annul." The power to "disapprove" and to "annul," and the manner of its exercise, are plain. Regarding them we do not differ, except as a minority here hold that the legislative declaration necessary to put a law into immediate effect is conclusive that it is not referable.

"Suspension" is different. In a proper context, the word might embrace any or all of the meanings in the various accompanying opinions attributed to it. We all agree that, as to acts taking effect ninety days after adjournment, its purpose and effect are to prevent the law from becoming operative. It maintains the status quo, pending the popular verdict. But, if it operates at all on an act already in effect, its result is farther reaching. It upsets the status quo. It perhaps restores the status quo ante. At the very least, it leaves a period of ninety days

during which an act is or is not in effect, according as a petition has been or may be filed, or otherwise.

A result so disturbing can have no presumptions in its favor, and such a purpose should not be inferred from anything short of clear expression. Particularly is this true when we recall that "suspension" is accomplished by the mere filing of a petition, with no safeguards or sanctions, the informal and perhaps unstudied or impetuous gesture of a minority of the voters.

On the other hand, disapproval and annulment is the formal and deliberate act of the majority of the voters, the ultimate sovereignty, performed under the sanctions of the election laws. The power itself plainly appears, as well as the machinery for its exercise. It should not be frittered away by construction.

Having concluded that an act already in effect may not be suspended, it is easy to jump to the broader conclusion that it may not be referred. But this seems to me to confuse cause and effect. The power to suspend is denied, because, within the meaning of the Constitution, there can be no suspension of an existing and operating law; not because of the legislative declaration by virtue of which the effectiveness of the statute has been merely advanced in date.

Undoubtedly the judiciary owes great deference to its co-ordinate governmental branch, the Legislature. Where the latter has a function to perform under a given state of facts, or in a certain situation, its finding of the facts or its declaration of the exist-

ence of the situation will be conclusive. Accordingly, we have just held that the exercise of the legislative power to give immediate effect to its enactments cannot be challenged by asserting the falsity of the facts or situation found to exist.

But we are here dealing with a judicial function. However we may be influenced, we cannot be controlled, by a declaration made by the Legislature for a different purpose and in the exercise of a different power. I say the function is judicial. Admittedly it is as to all of the numerous classes of statutes excluded from the referendum, except "safety measures" alone. Even as to them, if the emergency clause has failed of adoption, the question is for the courts.

The contrary view results solely from similarity of definition in sections 1 and 23, art. 4, Const. The necessity of the statute "for the preservation of the public peace, health and safety" is conceived as a fact, which, found to exist by one branch of the government, cannot be questioned by another with convenience or propriety.

To my mind it is not a fact. It is a very general concept, and necessarily a matter of opinion, an opinion that may differ greatly according to the case in hand, whether there is involved the immediate effect or the referable character of the law. In legislative practice the criterion has long been interpreted most liberally. If this be an abuse, as some urge, it need not excite great alarm. Under modern conditions, it cannot matter greatly if the Legislature, for convenience or expediency, shall give immediate effect to a law, which, according to strict constitutional

interpretation, should remain ineffective for ninety days.

But, if the legislative declaration is decisive against the referendum, a new and different importance attaches to it. A conscientious Legislature will employ it with scrupulous care. There will be either an unnecessary restriction of the useful legislative power to act with speed or an unnecessary restriction of the popular power to disapprove. I am not persuaded that the Constitution makers intended so to relate these different matters or to produce such result. The constitutional criterion is there for the guidance of the conscience and judgment of the tribunal called upon to act in the particular case, and in consideration of the consequences of its action.

Where there is so much difference of opinion, there cannot be complete assurance. My vote is cast and my views are expressed with the utmost deference to the contrary views of my associates.

BICKLEY, Justice.

I agree with Mr. Chief Justice WATSON and Mr. Justice ZINN that the circumstance that the Legislature declared an emergency to exist, which made it necessary that chapter 171, Laws 1933, take immediate effect and be in full force from and after its passage and approval, does not foreclose a decision by the courts as to whether the act is within the exceptions from the reserved power of the electors of the state to disapprove the act if a proper 10 per cent. petition is timely filed demanding a vote on the question of its approval or disapproval, as guaranteed in section 1 of article 4 of our Constitution.

I assert further, however, that the same circumstance was without effect to accomplish the declared purpose of putting the act into immediate effect, unless such act is within such exceptions from the people's reserved power.

The question here seeking solution is of grave importance. It involves the right of the people under their Constitution to enter into, and become a part of, the lawmaking power of the state.

I participate in making up a majority who say that the lawmaking power to disapprove and repeal any law enacted by the last preceding session of the Legislature within the people's power to disapprove has not been, and cannot be, destroyed by the Legislature by appending such emergency clause.

This power to disapprove and repeal, however, was only a part of the lawmaking power which the people reserved to themselves. The Constitution, § 1, art. 4, says: "The people reserve the power to * * * suspend and annul any law enacted by the legislature [except certain laws]." I accept the view that "suspend," as here used, does not mean to temporarily annul or deprive of effect a law which has already been, in effect, but, as Brother SADLER phrases it, suspends the taking effect of the law.

The suspension being accomplished, this is not the end of the matter. Suspension of a law has not accomplished "its rejection," nor its approval by the people in the exercise of their reserved lawmaking power. When an

act of the Legislature is thus in suspension, "the question of its approval or rejection shall be likewise submitted to a vote." If the majority are for its rejection, "it shall thereby be annulled; otherwise it shall *go into effect.*" It will be noted that it is not said that it shall not go into effect *again.*

It appears to be clear from a reading of section 1 of article 4 alone that the reserved power of the people to enter into and become a part of the lawmaking power embraces the *repealing power* and also the power to say that certain acts shall not *become* law at all.

I join the CHIEF JUSTICE and Mr. Justice ZINN in deciding that section 23 of article 4 has not put it within the power of the Legislature by attaching the emergency clause to destroy the power of the people to repeal certain laws, but they join with Mr. Justice SADLER and Mr. Justice HUDSPETH in saying that said section 23 has put it in the power of the Legislature by attaching such emergency clause to prevent the exercise of that other reserved power of saying that certain laws enacted by the Legislature shall not *become* law. To this I cannot agree.

A superficial survey of section 1 and section 23 of article 4 does suggest some inconsistencies. In constitutional construction the rule always obtains that the intent of the people is the intent to be ascertained and upheld. If there is any real conflict between the reserved power of the people as expressed in section 1, with a power *delegated* by the people to the Legislature in section 23, the latter should yield. A casual examination of the two sections, however, construed together, convinces me that the conflict, if any, is more apparent than real.

As to the repealing power which may be exercised upon the demand of a 10 per cent. petition, it being apparent that the law may not be repealed until the vote of the people is taken at the next general election, such petition may be filed at any time before four months prior to the election, it is a matter of no particular concern in the exercise of this power as to whether the act has gone into effect immediately upon its passage and approval by virtue of an emergency clause or after the lapse of 90 days after the adjournment of the Legislature.

The people by section 1 of article 4 intrusted the determination as to whether certain laws shall go into effect 90 days after the adjournment of the Legislature to 25 per cent. or more of the qualified electors of each of three-fourths of the counties and in the aggregate of 25 per cent. of the qualified electors of the state.

By section 23 they intrusted to the Legislature to determine whether certain acts shall go into effect 90 days after the adjournment of the Legislature or immediately upon their passage and approval. By these two sections the Constitution makers have in effect said to the Legislature: "As to laws providing for the public debt or interest thereon, or the creation or funding of the same, except in this constitution otherwise provided; laws providing for the maintenance of the public schools or state institutions; local or special laws and other laws providing for the preservation of the public peace, health or safety, you may exercise

your own judgment subject to the limitations of section 23 of article 4 of this constitution, whether they shall go into effect immediately upon their passage and approval or 90 days after the adjournment of the legislature enacting them. You have no option of discretion as to the effective date of 'general appropriation laws,' we hereby fix the time of going into effect of 'general appropriation laws' as 'immediately upon their passage and approval.' We reserve the right to *suspend the taking effect* of *any law* enacted by you except those heretofore described. In order to enable the people to consider whether certain laws shall take effect 90 days after the adjournment of the session of the Legislature at which such law was enacted, 90 days after such adjournment time is provided within which to afford an opportunity for 25 per cent. or more of the qualified electors of each of three-fourths of the counties and in the aggregate of 25 per cent. or more of the qualified electors of the state to file a petition with the secretary of state, demanding an opportunity to approve or reject such laws. If such petition is filed, the going into effect of the law petitioned against is suspended, and at the next general election, "if a majority of the votes cast thereon and not less than 40 per centum of the total number of votes cast at such general election be cast for its rejection, it shall be thereby annulled; otherwise it *shall go into effect* upon publication of the certificate of the Secretary of State declaring the result of the vote thereon."

By the enumerated exceptions from the reserved referendum power, certain laws are beyond the power and control of the people. As to such laws, the exercise of the power delegated to the Legislature is specifically made final. It is apparent that outside of the exceptions the referendum provision has withdrawn the power of the Legislature to act with finality, or, more properly speaking, has withheld the power to act with finality. The people have reserved to themselves the power to put the stamp of finality upon certain laws. I do not discover any provision of the Constitution indicating that it is intended that the Legislature may divest the people of this reserved power.

There is nothing else for this obvious declaration of section 1 as to when referable laws shall take effect to operate on except the power delegated to the Legislature in section 23. If the people have a right to suspend through specified procedure the taking effect of certain legislative acts in the process of *becoming* laws in order that they may exercise the right to annul them, it is an invasion of that right for the Legislature to attempt to put them into immediate effect. How can the Legislature cause to go into immediate effect an act which has not *become* a law? Acts of the Legislature are still in the process of *becoming* laws when they leave the hands of the Legislature. Some will become laws when approved by the Governor. Other will become laws when approved by the Governor, or again passed over his veto, and no extraordinary referendum and suspension petition is filed.

Similar questions have been before the courts before, and the question has arisen as to whether to reconcile an apparent conflict

it was more reasonable to read into a section of the Constitution corresponding with our section 23 of article 4 the provisions of a section corresponding with section 1 of article 4 or the reverse. The Supreme Court of South Dakota, in the case of State v. Bacon, 14 S. D. 394, 85 N. W. 605, in an ill-considered opinion, took the position that the section of the South Dakota Constitution respecting the time of taking effect of laws under legislative declarations as to emergencies should be read into the referendum provisions of the Constitution. But in a later case, State v. Whisman, 36 S. D. 260, 154 N. W. 707, 711, L. R. A. 1917B, 1, this holding was repudiated. The learned court, in a unanimous opinion by presiding Justice McCoy, held that the two sections should be construed and read together as if forming different parts of but one section. It therefore follows, said the court in the later case:

"That the Legislature, by necessary implication, is only authorized to declare emergencies in that class of measures specified in the said exception to the referendum clause. As to all emergency measures and acts within the purview of this exception, the Legislature may declare an emergency to exist. * * * But as to any measure, law, or enactment clearly not within the class of emergency measures specified within said exception, the Legislature has no power or authority to declare an emergency to exist in relation thereto, by any vote, however large the same may be; and the action of the Legislature in embodying emergency clauses in measures clearly not comprehended within the said exception are wholly unwarranted and

void, and should be so held by the courts. Not that the act itself would be void, but the emergency clause would be void, with the result that the act would not go into effect until the 1st day of the next July, and also with the result that, in the event of a proper referendum petition being filed as required by law, such enactment would not go into effect until approved by a majority vote of the electors of the state."

Arkansas Tax Commission v. Moore, 103 Ark. 48, 145 S. W. 199, is in complete accord with the later South Dakota case.

In Sears v. Multnomah County, 49 Or. 42, 88 P. 522, the Supreme Court of Oregon had occasion to consider a similar question, and it likewise held ineffective an emergency clause to put a referable act into immediate effect. It was held in that case that the act in question would not become effective until 90 days after the approval of the Governor, notwithstanding it bore an emergency clause which would have carried it into effect under the Constitution if it were not for the referendum provisions. In this case the question was squarely presented and the court was unanimous.

In the case of State v. Meath, 84 Wash. 302, 147 P. 11, the Supreme Court of Washington decided, in accordance with the decisions from South Dakota, Arkansas, and Oregon, that, since the adoption of the referendum amendment, an emergency clause complying only with the original Constitution would not be effective to carry the law into immediate operation. In that case an act was passed changing the personnel of the

state board of land commissioners. An emergency clause was attached stating that the act was necessary for the immediate preservation of the public peace and safety, and for the support of the state government, wherefore it should take effect immediately. While there was a marked difference of opinion among the judges as to the propriety of going back of this legislative declaration of an emergency, the court seemed to be agreed that the law could not go into immediate operation save on the assumption that there had been a full compliance with the referendum emergency exception.

In the case of State v. Carter, 257 Mo. 52, 165 S. W. 773, the Supreme Court of Missouri construed a referendum amendment which was substantially like ours. In that case the referendum had been invoked, but the court, in determining whether or not the act referred to was in effect prior to the election, approved and adopted interpretations of the courts of Arkansas and Oregon above referred to.

Again in State v. Missouri Workmen's Compensation Commission (1928) 318 Mo. 1004, 2 S.W.(2d) 796, 800, that court, referring to laws not excepted from the operation of the referendum provision, said: "All other laws are subject to its operation; and, ninety days being given by its terms from the final adjournment of the session of the Legislature which passed them in which to demand or order the referendum thereon, they cannot take effect or go into operation till the expiration of ninety days after such adjournment."

In State v. Sullivan, 283 Mo. 546, 224 S. W. 327, 334, the Missouri Supreme Court made some observations that support my view. In that case, the broad position was taken that no law passed with an emergency clause is the subject of referendum under the Missouri Constitution: "In other words the legislature can foreclose the constitutional right of referendum by simply tacking on and passing an emergency clause. This idea is not sound, nor does it comport with the weight of the better reasoned cases." The case involved the consideration of several parts of the Constitution, and among them the referendum provision. The court calls attention to a sentence of the referendum provision of prime importance as follows: "But the people reserve to themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the Legislative Assembly, and also reserve power at their own option to approve or reject at the polls *any act* of the Legislative Assembly."

The Missouri court said: "Note the comprehensive term 'any act' as used above."

The same is true of our section 1, article 4: "The people reserve the power to disapprove, suspend and annul *any law* enacted by the legislature, except general appropriation laws," etc. The court went on to say:

"The emergency clause to the measure under consideration does not attempt to declare such measure to be of the excepted class in the constitutional provision named. It only declares in a way, the legislative reason for the conceived emergency. It does not de-

clare that the measure is 'necessary for the immediate preservation of the public peace, health, or safety.' If it had so declared the declaration would have been false on the face of the measure itself. But for our present purpose it suffices to say that the emergency clause does not bring the measure within the excepted class named in the Constitution. So that, unless a mere emergency clause will exempt the measure from referendum, the contentions of plaintiffs and relator must fall. They urge that under section 36 of article 4 the Legislature has the power, by expressing an emergency in the face of the bill, and passing the emergency clause by a two-thirds vote, to put any law into immediate effect.

"We do not so view the matter. The force and effect of section 57, when read with section 36 of said article 4, is to withdraw from the power of the Legislature to put into immediate effect any measure subject to the referendum. The two sections must be read together and made to harmonize in the light of the history of the constitutional provisions. Section 57 contemplates that 'any act' of the Legislature is subject to the referendum, save and except the measures therein specifically named. The term 'any act' covers measures which were theretofore subject to the emergency clause, spoken of in section 36, so that it should be ruled that measures not excepted by section 57 are not subject to an emergency clause, but only become effective at the end of 90 days, when the time for referendum has expired. In no other way can these two sections be made to harmonize. Sears v. Multnomah County, 49 Or. loc. cit. 43, 88 P. 522."

The Missouri court held:

"That the exception in the amendment [referendum provision] should be read into section 28 of article 4. Otherwise the reservation in the amendment that 'the people reserve * * * power at their own option to approve or reject at the polls any act of the legislative assembly' would be rendered futile. * * . * We believe the amendment makes its own exceptions, and, if those conflict with section 28 of article 4 [emergency clause provision], they will constitute a limitation upon it to that extent.

"That an act may take effect under a general emergency clause, and yet be subject to the referendum, is clearly contrary to the intent of the amendment, and would produce disastrous results. The clause in the amendment which reads, 'Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise,' clearly means that a law upon which the referendum is invoked cannot take effect prior to its approval by the vote; and consequently no act that is subject to the referendum can be made to go into operation for 90 days after the adjournment of the session or its approval by vote. * * *

"The language, supra, 'We believe the amendment (in Missouri, section 57) makes its own exceptions, and, if those conflict with section 28 of article 4 (in Missouri, section 36 of article 4), they will constitute a limitation upon it to that extent,' are sufficient and satisfying. No other construction can be given which will give force and effect to both sections. This Oregon case met with our ex-

press approval in State ex rel. v. Carter, 257 Mo. loc. cit. 70 et seq., 165 S. W. 773, supra.

"The force of the rule is that the Legislature cannot give immediate effect to any measure which is subject to referendum, but may or may not (by an emergency clause) give immediate effect to nonreferable laws. When read together these constitutional provisions mean that by no process can the Legislature preclude the referendum upon measures subject to reference by the terms of section 57, supra. That the term 'any act,' as therein used, is broad enough to cover the measure before us cannot be questioned."

The Missouri court cited with approval the following statement of the Colorado Supreme Court in Re Interrogatories of the Governor, 66 Colo. 319, 181 P. 197, 7 A. L. R. 526:

"The conclusion is irresistible that no act, not of the excepted class, can have the force of law, or can become operative until after ninety days from the adjournment of the assembly at which passed, and, if referred, then not until approved by a majority of the people by vote at a general election.

"It is argued that the emergency clause of the Constitution above recited was not repealed by the initiative and referendum amendment. This requires no argument. It was not repealed. It is as effective now as it was before the amendment in so far as the Legislature has power to finally enact statutes. When the General Assembly had the absolute power to enact all legislation, the emergency provision was applicable to all acts of the body. But when the power to finally enact legislation was withdrawn from the General Assembly except as to certain classes, then manifestly the emergency provision could apply only to acts within the power of the Legislature to finally enact. Plainly the Legislature cannot act in an emergency where it has no power to act at all. It can only apply the emergency clause of the Constitution to an act to which it has the power to give finality."

It appears from reading our Constitution relating to the legislative department, and particularly section 1 of article 4, that the dominant purpose manifested is that of securing and safeguarding the right of the electors to legislate. We should avoid a construction contrary to this dominant purpose. It ought not to be presumed that the framers of the Constitution intended to put beyond the power of the electors to exercise a power reserved to them or to render futile such power. See State v. Sherman (N. D.) 245 N. W. 877, 879.

A case which supports my argument in several particulars is State National Bank v. Board of Councilmen (1925) 207 Ky. 543, 269 S. W. 726. The syllabus which indicates the decision is in substance as follows:

"1. Under referendum clause of Const., § 171, as amended in 1915, a legislative act subject to referendum does not become effective until after time allowed within which to file referendum petition, if none be filed, but, if one is filed, it becomes effective when approved by people.

"2. Const. § 55, providing effective date of legislative enactments so far as conflicting with referendum clause, section 171 must be controlled by latter."

The court said:

"After careful consideration, we have come to the conclusion that on principle and authority the better view is that the acts of the Legislature subject to a referendum do not become effective until after the time allowed within which to file a referendum petition. This was the view of the lower court.

"The purpose of the referendum amendment to our Constitution was to allow the people to pass directly upon all the acts of their Legislature which come within its purview. The period of time fixed within which the people should have the right to file a referendum petition was undoubtedly so provided in order that the people might, in the meantime, inform themselves concerning what their representatives had done; that they might have full opportunity to discuss the same, to make up their minds as to what they wished to do; and, in the event they wished to test the sentiment of the state, to get up the necessary petition to order a referendum. Pending this time, it was not the purpose of the referendum amendment that acts passed but subject to its power should become laws or that the Legislature should have the right to put into effect acts which the people might reject. * * *

"Further, the language of the amendment itself when it says that 'any measure referred to the people shall take effect and become a law when approved by the majority of the votes cast thereon, *and not otherwise*' leads to the same conclusion. If appellant's contention be correct, then acts subject to a referendum have the force of law until suspended by the filing of a referendum petition. But the amendment provides that such acts take effect and become law only on the contingency of their approval by the people. If such acts take effect before a petition is filed, how can they be made to take effect again on a different contingency or on a different condition? How can a measure become a law on the contingency of its approval by the people and 'not otherwise,' if it was already a law before the voting happened?"

From all of the foregoing, I conclude that section 23 and section 1 of article 4 of the New Mexico Constitution must be read together. The exceptions provided for in section 1 (referable laws) must be read into section 23, and, to the extent they conflict, section 1 will constitute a limitation upon section 23. The fair interpretation from the two sections as thus read together is clearly that acts, subject to referendum, become laws on the expiration of the time allowed for the filing of the extraordinary 25 per cent. petition without such being done, and, if such extraordinary petition be so filed, only when approved by the people, at the election called for in section 1.

In Hutchens v. Jackson, 37 N. M. 325, 23 P.(2d) 355, recently decided, it was claimed that the Legislature had violated section 23 of article 4, and we denied the claim, or, rath-

er, we said that we would not inquire into the question of whether it had violated that provision or not. We are now to consider the graver question, not presented to us in that case, of whether the Legislature violated section 1 of article 4 by saying that the act went into effect immediately if we find that it is a referable statute. As to laws to which the Legislature has the power to give finality, the rule of Hutchens v. Jackson is appropriate. As to laws to which the people have the power to give finality, it is not applicable. The questions here considered were not presented in that case. It is unfortunate that they were not. If the effect of that decision is to destroy the reserved right of the people to say that referable acts shall not *become* law, then it should be modified.

It is proper to remark that the middle ground taken by the CHIEF JUSTICE and Mr. Justice ZINN was not presented by counsel in the case at bar. It was assumed in the briefs and on the argument that, if the law in question were subject to referendum, it could be suspended by the proper petitions for suspension and referendum being filed.

It is claimed that, if the Legislature attaches the emergency clause to an act, uncertainty would exist as to the effective date thereof for 90 days at least, depending upon the fact of whether the act is referable or not, and whether a suspension and referendum petition will be filed within 90 days after adjournment. There is always in the offing the question as to whether the Legislature has kept within constitutional bounds. But we cannot change the Constitution by mere force

of opinion, just because some hardships may be occasioned by following the Constitution. The Constitution may have made it hard upon a few litigants to be put to a decision as to whether a certain act bearing the emergency clause is within the rather broad exceptions from referendum named in section 1 of article 4, but this would be no reason to ask this court to rewrite the Constitution. The fixing of most any effective date might work some hardships. And, furthermore, the hardship of waiting 90 days after adjournment of the Legislature to find out whether an act goes into effect is reduced to a narrow compass, since the Constitution in section 1 of article 4 has withdrawn from suspension and referendum all the public "safety" acts.

The great importance of the question, involving as it does our organic law, has seemed to justify my setting forth at length my views, since I am unable to impress them upon my associates, whose opinions I hold in high respect.

#### On Motion for Rehearing.

WATSON, Chief Justice.

Appellee's motion for rehearing and accompanying brief present nothing which we had not fully considered before announcing the decision, and we are not moved to vary our respective conclusions. The motion for rehearing is accordingly denied.

This may well be the occasion, however, as suggested by the learned Attorney General, somewhat to clarify the result to which our varying conclusions have brought the court as disclosing the present state of the law.

By majority we hold that the presence of the emergency clause does not of itself defeat the right of referendum, and hold that, when and if the referable character of the act becomes a judicial question, it is to be determined by the courts independently of the legislative declaration employed in giving the act immediate effect. By a majority differently constituted, we hold that the right to suspend the operation of a statute by filing petitions does not extend to an act which is already in effect.

Applying those holdings to this case: The statute in question was, at the time its enforcement was enjoined, and is now, in full force and effect. The filing of the 25 per cent. petition did not disturb its present validity or operation. But, though unavailing to suspend the operation of the statute, it was and is efficient as a 10 per cent. petition to invoke the referendum, subject to a possible judicial determination hereafter that the act is of a nonreferable character.

There can be no reasonable doubt, therefore, as to the result which may hereafter attend popular disapproval of the statute. It will not be "annulment" in the sense of annihilation or avoidance ab initio which follows disapproval of an act whose operation has been suspended. It will be "annulled and thereby repealed with the same effect as if the legislature had then repealed it," with the additional effect that "such repeal shall revive any law repealed by the act so annulled."

SADLER, HUDSPETH, BICKLEY, and ZINN, JJ., concur.